## CARDER v. McDERMETT.

The fact that land is in the adverse possession of another, whether the owner be disseized, dispossessed or by whatever name denominated, is no restraint on the owner's right of alienation, in this State. This decision does not affect the questions of maintainance or champerty, strictly and properly construing those terms.

Error from Dallas. *Action of trespass to try title*, by the plaintiff in error against defendant in error. Answer, among other matters, that the plaintiff purchased the land while the defendant was in the open and notorious adverse possession of the same, claiming it as his own, of which the plaintiff had notice at the time. Exceptions to the plea overruled; verdict and judgment for the defendant. Writ of error by the plaintiff.

*T. J. Jennings*, for plaintiff in error. From want of time, we decline reviewing the old English authorities on this question, because but few of them are accessible to us, and present the latest American authorities at hand. In Ohio and Michigan, it is held that "the sale and conveyance by one out of "possession of land, at the time in the adverse possession of "another claiming title is not void." (Cresenger v. Welch, 15 Ohio, 156; Bruckner v. Lawrence, 1 Doug. 19; 7 U. S. Annual Dig., (1847) 120, Sec. 15.)

Again, "in Ohio there is no statute of champerty, and a "conveyance of land held adversely to the grantor is valid." (Hall v. Ashly, 9 Ham. 96.) So also in Illinois. (Willis v. Watson, 4 Scam. 64.) A still more liberal doctrine on this subject prevails in Delaware. (3 Harrington, R.)

The same liberal and enlightened views are advanced and well supported in the case of Thallhimer v. Brinkerhoff, 3 Cowen, 623.

And it may be assumed as generally true, that wherever in the other States of the American Union the supposed rigid doctrine of the ancient Common Law is strictly maintained and enforced, it has been done by statutes, creating the offence, not reviving or declaring the Common Law, and scarcely any of these statutes have been passed in the last twenty years, but all or nearly all of them shortly after the American Revolution, when we had not had time to divest ourselves of English prejudices. But for the last twenty or thirty years legislative, popular and judicial opinion have been alike advancing in enlightenment on this matter, both in America and England. (Wallis v. Duke of Portland, latter part of note A, 3 Vesey, 494.)

We invoke also the spirit of the decision of this Court in White v. Gay's Executors, 1 Tex. R. 325, as applicable to the facts of this case, although that decision turned, so far as the particular controversy was concerned, on a different system of jurisprudence.

*Burford* and *Reagan,* for defendant in error. The only question, in the present attitude of the case, which we suppose it necessary to discuss, is whether the principles of the Common Law, which forbid the selling of lands by persons out of possession, when held adversely to the vendor, are to be considered in force in this country. (Co. Litt. Sec. 347, Lib. 3, chap. 5; Id. 214 b; 4 Bl. Com. 135; 4 Kent Com. 446; Bac. Ab. Title MAINTENANCE, Letter E; Jackson v. Todd, 2 Cains R. 183; Jackson v. Winslow, 2 Johns. R. 82; Jackson v. Hudson, Id. 375; Belding v. Pitkin, 2 Cains R. 149; Jackson v. Brinkerhoff, 1 Johns. R. 163; Jackson v. Vredenburg, Id. 159; Williams v. Jackson, 5 Johns. R. 489; Caldwell's Admr's v. Shepperd's heirs, 6 Mon. R. 390; 8 Yerg. R. 142; 7 Dana, R. 36; 9 Id. 385; 5 Mon. R. 159; 5 Pick. R. 384; Id. 538; 1 Russ. on Cr. 175; Id. 178, 180; Bac. Ab. Bouvier's notes, Title GRANT, Letter D; 4 Term R. 340; Willis v. Duke of Portland, 3 Ves. 494; 1 Ind. R. 127;

5 Pick. R. 356; 4 Conn. R. 575; 6 Wend. R. 224; 4 Wend. R. 474; 2 Johns. Cas. 58; 3 Cowen, 89; 5 Wend. 532; 5 Cowen, 74; 13 Johns. R. 466; 8 Wend. 689; 7 Wend. 53, 152; 11 Wend. 442; 13 Johns. R. 289; 1 Dana, 556; 2 Litt. 393; 1 Wheat. 292; 2 Litt. 225; 3 Dana, 309; 3 J. J. Marsh. 549; 2 Dana, 374; 6 J. J. Marsh. 490, 584; Walk. Intr. 297, 351, 352; 2 Wall R. 272; Ill. Rev. L. 130; Misso. Stat. 119; 2 Hilliard's Abgt. c. 33, Sec. 42 to 52; 1 Tex. R. 384; 6 Id. 275.)

What change of institutions has time wrought that would make the Common Law of England, as known and practised in the Courts of Massachusetts, New York, Kentucky, and other States in the Union, obsolete and inapplicable here? Is it because we are so far in advance of them in point of intelligence and liberal institutions? Is it because our legislators are more patriotic and wise, and our jurists more enlightened and profound? If these be not the causes we are unable to see why that which is law in England and in a number of the States of this Union, and has been adopted by our Constitution and laws, and stands unrepealed, is not law here. We may also add that by the law of 32 Hen. 8th, and other English statutes, more stringent remedies were given against these pests of civil society than existed at Common Law, as likewise by the statutes of the various States of this Union that have legislated on the subject; which shows that the common sense of mankind in different ages has not only improved but strengthened the Common Law in relation to this odious class of transactions.

*J. H. Rogers*, also, for defendant in error.

HEMPHILL, CH. J. The only question presented in the present attitude of this case is, whether a purchase of land from a vendor, out of possession, and where this is held adversely by another under a claim of title, is valid and effectual to convey such title as will support against strangers an action of

ejectment or trespass to try the title. We approach the decision of this question with some embarrassment. The cause was fully argued some time since, and with such ability and elaborateness of investigation as reflected much credit on counsel, and would doubtless have been of signal advantage to the Court, had the forty or fifty cases and authorities cited been accessible. But unfortunately we have had the benefit of only the brief sketches of some of the commentators invoked, but without access to cases cited from the Reports. Under such circumstances we might have held the cause under further advisement, had it not already been much protracted, and were we not fully satisfied of the conclusions to which we have attained. And these we will proceed to express with all possible brevity.

It will be admitted as a principle not to be questioned, that the power to alienate property is a necessary consequence of ownership, and is founded on natural right. (4 Kent, 441.) True, it must be subjected to the restraints suggested by convenience, and dictated by the laws ; but wherever restrictions of any rigor, from considerations of policy well or ill-founded, have been imposed on alienation, history reveals the fact of incessant struggles against the thraldom. And the success of these efforts appears to have been commensurate with the advancement of civilization, and of more just and enlightened views relative to the true uses of property as subservient to the multiplied wants of refined, social life. Without recurring to English history, and the ages of perpetual warfare there against the feudal shackles on the rights of alienation, we may, from the events of our own time and history, perceive how extremely distasteful are all restrictions on the power of the owner to dispose of his property. The restraints imposed for limited periods by the laws of colonization and emigration and on certain bounty claims were in a great measure disregarded and attempted to be evaded during their existence. Their limited periods were at times by law abbreviated, and those imposed for life entirely removed ; and so great, in fact, is the

---
---

repugnance to restraint when imposed by law, that even some testators submit unwillingly to restrictions on their testamentary power, even when the sole object of such restrictions is to secure, beyond the possibility of defeat, such provision for their children as nature and policy, the laws of heaven and the dictates of affection imperiously enjoin on parents, and to which every parent, not afflicted with unnatural estrangement, would yield spontaneous obedience. Does there exist in the nature of real property any such qualification of this right of alienation, or has any such principle of law been recognized in this State, as would deprive an owner, who has been ousted from possession, of the power to sell and convey such rights as he may have in the property? If there be, it would seem, (strange as it may appear,) that the legal effect of an outrage (even to expulsion from possession) would be to impair also the right in the property itself, at least so far as to deprive the owner of the previously existing power of alienation, and thus the wrong of the disseizor would, instead of being alleviated, be aggravated by the additional wrong inflicted by the law. The unfortunate owner, deprived of possession and the power of sale together, would be compelled either to surrender his rights, or involve himself in vexatious and harassing litigation, and thus, at the caprice of every marauder, he might be expelled from his habitation, and deprived of even the miserable right of selling his property and enjoying the proceeds in peace. Certainly there cannot exist in the subject matter of any property, any such principle as would, because a wrong has been perpetrated by a malefactor, inflict another by operation of law. Nor has any such legal principle been recognized or admitted to have practical force in this State. It may be admitted that in England and most of the States, such title as the one purchased by the plaintiff would be denominated a pretended title, the sale of which would, as against strangers, transfer no right; for, in the purview of the Common Law, all titles of persons who lay claims to lands while another is in possession, are thus denominated. (4

Carder v. McDermett.

Kent, 446.) This restriction on the power of alienation is attributed by Chancellor Kent to the statue of 32 Henry VIII, prohibiting the sale of title unless the vendor had been in the actual possession or had received the rents and profits for one year previous to the grant.

All such provisions in England, whether derived from the statute or the Common Law, were founded on a state of society which never had any existence in this country. We read of chieftains attending Courts with hundreds of retainers; and of course, under such circumstances, mere rights of action should not have been assigned, because, according to Lord Coke, under " color thereof pretended titles might be granted " to great men whereby right might be trodden down and the " weak oppressed." This is the reason given for not assigning choses in action or causes of action in those days; and it is extremely cogent, where the assignment brought the great in conflict with the weak. But is this the only aspect of wrong presented by the picture of those times ? Let us suppose the man of humble station to be dispossessed by his powerful neighbor. If so, his chance of redress would be quite hopeless. The predicate of the hypotheis is that the great were beyond the reach of the Courts; and of course, as the disseizee could neither sell his right nor invoke the aid of such as could struggle with his oppressor on equal terms, he must yield such claims as could be sustained by neither judicial protection nor individual power.

Let that be as it may, and whether the reason given for the rule be or not a sufficient justification in the times to which it applied, one thing is certain: no such condition of society has existed in this State, to authorize, under pretence of defeating combinatory and unhallowed schemes of oppression, any such rule or principle as would deprive an owner of the right to sell his lands, simply because there was another in possession.

That any such policy would operate most mischievously will be apparent from a glance at the condition of land titles in this State. Lands held by individuals are often at remote

distances from the residence of the owner and extend through various counties, sometimes scattered from the Sabine to the Rio Grande. They are owned frequently in large quantities; and whether in large or small, their cheapness often requires the sacrifice of great portions of them to meet the necessities of the owner. In fact, these necessities have made them a common article of commerce, and as such they are treated in the habitual dealings of the community. Besides the title owners are in constant danger of preclusion from the short terms of adverse possession, say three years under color of title; and further the contest between the disseizor and the disseizee is, on the principle contended for, waged on very unequal terms. While the disseizee is powerless, without possession or the right of sale, the usurped possession of the disseizor may be transferred from one to another, and the adverse possessions may be tacked together to complete the bar of the statute. Thus the owner might find all his tracts in different and remote counties intruded upon at the same time; and, under the policy against alienation, would be disabled from selling any of his lands to meet his most urgent wants, and in fact would have no other alternative than to surrender his property and encounter personally an appalling litigation, to be perpetuated perhaps beyond the close of his life, a litigation to be conducted not against one disseizor alone, but against all who may have confederated to defeat his right by successive adverse possessions.

The fact that persons out of possession may sell titles which have no foundation in law and which may be purchased for no other purpose than vexation and the profits of litigation, is no sufficient reason why all lawful owners, ousted of possession, shall be deprived of control over their property. This would be punishing the community in order that some pests might not escape. If the ancient rules of the Common Law with respect to the non-assignability of mere rights or choses in action and also with respect to the modes of conveyance of real property, were still recognized, then there might be some rea-

Carder v. McDermett.

son for the rule. For, at Common Law, no interest could be conveyed, except where the grantor was in actual or constructive possession of the thing granted. And this was on the general ground that such conveyance would multiply suits, and be transferring lawsuits to strangers. Hence, a debt or other chose in action could not be assigned, (2 Story, 1039,) nor could a right of entry or action in real property. This notion against the assignment of choses in action has long since been exploded, but in relation to assignments of rights of entry has more firmly maintained its ground. And under the earlier mode of conveyance by feoffment there was some reason for holding that a right of entry could not be assigned by one out of possession. For as the livery of seizin was a component part of the transfer by feoffment, it was necessary, in general, that the feoffer should have actual possession at the time of the livery made, although it seems that under some special circumstances, when livery could not be made upon the land, it might be made within view, and was thus effectual to transfer the right of entry, and was so far an exception to the general rule that a right of entry could not be transferred by one out of possession.

But, under the modern and ordinary forms of transfers, no actual possession is necessary to give validity to conveyances. The seizin by deed draws to it the constructive possession. And if there were any good reason for relaxing the ancient law with respect to the necessity of actual possession to the validity of a transfer, making constructive possession sufficient, there seems no good reason why the mere usurpation of a possession should invalidate a conveyance, when actual possession was not necessary to make it good.

There are some refined distinctions between the effect of a disseizin and dispossession, and in a very elaborate disquisition appended to the cases of Doe v. Oliver and the Duchess of Kingston, in Smith's leading cases, it is maintained that according to the present state of the law in England, where a title has been reduced by actual disseizin to a mere right of

entry, it can be neither devised or granted, yet when there is only adverse possession, it may be devised, and if there be no maintenance it may also be conveyed.

But it is not necessary to trace the effect of these distinctions, as they will not control the decision. For we are of opinion that whether the owner be disseized or dispossessed, or by whatever name his being put out of possession may be denominated, yet that he has such right as will enable him to make a valid conveyance, effectual in law to support an action to try the title. This doctrine exists in some of the States.

In Pennsylvania it is said in 6 Binney, 421, that from the equality of persons in this country, there was no danger of maintenance, from the influence of powerful individuals, and the abundance and cheapness of lands rendered it necessary to admit of its transfer with almost as much facility as personal property. For these reasons, where deeds and devises of lands have been considered in our own Courts, it has never been made a question whether the grantor or devisor was in or out of possession. These remarks portray with great exactitude the condition of things in this State, and the reasons which sanction a transfer by the owner out of possession have at least as much cogency in this State as in Pennsylvania.

The usage of the country has been generally, if not universally, based on the hypothesis of the power of free disposition of lands, whether the owner be in or out of possession. Many contracts have been made and rights have accrued on the supposition that such was the law of the land. The usages of a people, where there is no principle or one which is obsolete have much force in fixing the law itself. The fact that there is a different usage or different principle elsewhere, can have but little weight, as each State or community must adopt that which suits their own convenience or interests and their respective wants and condition. There may be, and there are states of society in which such a restraint on alienation would be necessary to repress the mischiefs of litigation which might flow from the unrestricted license of alienation. This condi-

tion of society, when it arises, can be met with its appropriate remedies. It does not exist now or here, and a right should not be restrained because there may be a time when this will become necessary or expedient.

I have not discussed the doctrines of maintenance or champerty in this opinion, for the reason that they do not properly arise in the cause. Maintenance consists not so much in taking a conveyance of the whole or part of a thing not vested in the party by whom it is made, as in taking it in consideration of assistance or maintaining a suit for its recovery. This conveyance is of the entire interest or title in the property, and the vendor has no share or interest in the suit, and from general principles and from authorities in which no countenance is given to maintenance, it is admitted that a party may purchase the whole interest of another in a contract or security or other property which is in litigation, provided he does not undertake to pay any costs or make any advances beyond the mere support of the exclusive interest which he has acquired. (2 Story, Eq. 1050.) If he can do this after, he certainly on principle might do it before litigation. And if he can purchase mere rights in personal, there is no reason why he should not do the same in real property. No opinion is intended to be given on the question of champerty or maintenance, which can be decided when they are distinctly presented. Judgment reversed and cause remanded.

Reversed and remanded.