## A. A. GRAY ET AL. v. GEORGE FREEMAN.

### Decided January 4, 1905.

**1.—Avoiding Contract—Duress.**

The free will of the contracting parties is essential to the making of a contract, and if by the wrongful conduct of one party the other is bereft of his free will power, the contract obtained thereby may be avoided on the ground of duress.

**2.—Duress—Standard Determination.**

Whether there was duress is to be determined, not by any arbitrary standard, but by the resisting power of the party under all the circumstances of the case.

**3.—Duress by Fear—Imprisonment of Child.**

Under the law of duress by putting in fear, a man's child stands in the same position as himself and fear of imprisonment of a child will destroy the free agency of the parent, and the agreement he makes under such circumstances can not be enforced.

**4.—Cancellation of Deed—Duress—Assignment of Cause of Action.**

A deed of trust to certain land was obtained from plaintiff's father, a blind old negro over 70 years of age, by promised immunity from criminal prosecution of a son who had given a deed of trust on the same land, representing it to be his, and borrowed money thereon. Held, that an action to cancel the deeds of trust, instituted by the father, did not die with him, but plaintiff, another son to whom the father had transferred his title in consideration of support and maintenance the remainder of his life, could prosecute the suit.

**5.—Same—Same—Pleading—Evidence—Harmless Error.**

While an allegation that the facts connected with the execution of a mortgage, which was obtained by duress, were imparted to plaintiff by the mortgagor should, perhaps, have been stricken from the petition, and testimony sustaining such allegation excluded, as hearsay and immaterial, the failure to do so was not reversible error where no injury is shown to have resulted to appellants thereby and all the other testimony tended to show that the mortgagor was under duress when he executed the mortgage.

**6.—Duress by Fear—Pleading and Proof.**

An allegation charging that the mortgage was obtained by direct threats to imprison the mortgagor's son unless it was given, held sustained by proof that the mortgagee's agent informed the mortgagor that his son was guilty of a penitentiary offense and assured him that if he would give his note, secured by the mortgage, the mortgagee would not go out of his way to prosecute the son.

**7.—Pleading and Proof—Harmless Error.**

Allegations and proof as to what was the consideration for the execution of the deed to plaintiff from his father were utterly immaterial, the deed itself reciting the consideration, and could not have injured defendant.

**8.—Same—Consideration.**

Evidence to prove an agreement between plaintiff and his father, in which the latter agreed to prosecute the suit for plaintiff who agreed to support him during his life, was not objectionable as showing a different consideration from that recited in the deed, or a contract to be performed in the future.

**9.—Duress—Evidence.**

Proof of statements °of defendant to members of the mortgagor's family shortly before the execution of the mortgage was admissible as tending to show what defendant probably said to the mortgagor.

**10.—Same—Same.**

A statement to the mortgagor's daughter and son-in-law that if they did not fix up the matter defendant would send the mortgagor's son to the penitentiary was admissible as showing a concerted plan to coerce the members of the family into paying the debt due from the son to the mortgagee.

**11.—Evidence.**

Testimony that the mortgage had been changed after its execution was admissible in support of the allegation that the note which it secured had been changed.

**12.—Same.**

The deed from the mortgagor to plaintiff was properly admitted in evidence whatever may have been the consideration therefor.

**13.—Same—Petition—Date of Filing.**

Proof of the date of filing of the original petition, filed in the case by the mortgagor before he assigned the cause to plaintiff, did not place the petition itself in evidence.

**14.—Illness of Juror—Signing Verdict.**

Where one of the jurors became ill during the trial and was excused by agreement of both parties, it was not necessary that the verdict be signed by the remaining eleven, the signature of the foreman being sufficient.

**15.—Compounding Felony.**

One who executes a mortgage for the purpose and with the understanding that his son shall not be criminally prosecuted for an offense he has committed, is not thereby guilty of compounding a felony.

**16.—Same—Repudiating Unlawful Contract.**

Though the father had been guilty of compounding the crime of his son, that would not prevent him from annulling the unlawful contract.

**17.—Charge—Duress.**

A charge to find for plaintiff if the representations or threats of defendants exercised a controlling influence over the will of the mortgagor and induced him to execute the mortgage, and if without such threats he would not have executed the same, held applicable to the facts in evidence.

### ON MOTION FOR REHEARING.

**18.—Evidence—Fraudulent Representations.**

Fraudulent representations other than those alleged, made to the defrauded party or even to third persons, are admissible when so connected or a part of the general scheme to defraud as to show knowledge, intent or design.

Appeal from the District Court of Guadalupe. Tried below before Hon. M. Kennon.

*Wurzbach & Woods* and *Ball & Ingram,* for appellants.—1. In the absence of mistake, fraud or accident in the execution of the deed from Sam Freeman, Sr., to George Freeman, which intervener did not plead or proven. Weaver v. City of Gainesville, 21 S. W. Rep., 317; The deed recites the consideration and acknowledges receipt thereof before the instrument was executed, and parol evidence was not proper to add to the same in the absence of fraud or mistake which was not plead or proven. Weaver v. City of Gainesville, 21 S. W. Rep., 317; Byers v. Byers, 32 S. W. Rep., 925; Womack v. Wamble, 27 S. W. Rep., 154; Rotan Grocery Co. v. Martin, 57 S. W. Rep., 706; Walter v. Dearing, 65 S. W. Rep., 380; Baum v. Lynn, 30 L. R. A. 441; Maigley v. Hauer, 7 Johns, 341.

2. The court erred in refusing to set aside the verdict of the jury because it appeared that during the deliberations of the jury after the trial of the case, one of them was excused because of unavoidable sickness and the verdict of the jury is not signed by the remaining eleven jurors as is required by law, and is therefore void. Constitution of Texas, art. 5, sec. 13; Lumber Co. v. Hancock, 70 Texas, 312; Banna Co. v. Wolfe, 22 S. W. Rep., 269.

3. The court erred in refusing the special charge No. 1, asked by A. A. Gray and J. M. Taylor because upon the case as made out by the intervener his grantor executed the deed of trust sought to be cancelled with the distinct understanding on his part that his son Sam Freeman, Jr., was not to be prosecuted for a felony, and the

same would amount to the compounding of a felony, and this suit being one in equity and asking for equitable relief, and this court sitting as a court of equity could not lend its assistance to the relief asked for.

We will treat the above assignment as a proposition. Spaulding v. Crawford, 27 Texas, 155; Welborn v. Norwood, 20 S. W. Rep., 1129; Booker v. Wingo, 7 S. E. Rep., 49.

4. Although Sam Freeman, Sr., may have been overcome by fear, yet if he executed the deed of conveyance to make reparation for the conscious guilt of his son, and agreed to assume the debt of his son, the contract was a valid and binding contract. His fear of the lawful punishment of Sam Freeman, Jr., can not be regarded as duress. Landa v. Obert, 45 Texas, 540; Landa v. Obert, 78 Texas, 33; Largent v. Beard, 53 S. W. Rep., 90; Helborn v. Buckman, 57 Am. Rep., 816.

5. The duress or undue influence that will avoid a contract is such as deprives the party of his will and destroys free moral agency. Landa v. Obert, 45 Texas, 540; Landa v. Obert, 78 Texas, 33; Brown v. Mitchell, 75 Texas, 9; Largent v. Beard, 53 S. W. Rep., 90; Helborn v. Bucknam, 57 Am. Rep., 816; Wetz v. Schneider, 78 S. W. Rep., 394; 52 Central Law Journal, 326.

6. The verdict of the jury was contrary to the law, and the evidence, in that and because the evidence fails to show that the defendants practiced any duress upon Sam Freeman, Sr., or that Sam Freeman, Sr., was in any way overcome or compelled by any undue influence to execute the deed of conveyance sought to be cancelled in this case. Landa v. Obert, 45 Texas, 450; Landa v. Obert, 78 Texas, 33; Largent v. Beard, 53 S. W. Rep., 90; Loud v. Hamelton (Tenn.), 51 S. W. Rep., 140; Reichle v. Bentle, 70 S. W. Rep. (Mo.), 919; Coast v. Bank, 138 Ill., 559; Tiller v. Green, 26 Mich., 69; Helborn v. Buckman, 57 Am. Rep., 816; Bishop on Contracts, sec. 494; 39 Central Law Journal, 224.

*Dibrell & Mosheim,* for appellee.—A contract procured by threats of prosecution of a son, whether legal or illegal, is duress and will avoid the father's contract so procured. Perkins v. Adams & Co., 17 Texas Civ. App., 331; Hensinger et al. v. Dyer, 48 S. W. Rep., 912; Adams v. Irving National Bank, 116 N. Y., 167; Eadie v. Slimmon, 26 N. Y., 3; Morrison v. Faulker, 80 Texas, 132.

FLY, ASSOCIATE JUSTICE.—This is a suit originally instituted by Sam Freeman, Sr., against A. A. Gray, J. M. Taylor and Sam Freeman, Jr., to cancel two deeds of trust; the first executed by Sam Freeman, Jr., and the other by Sam Freeman, Sr., on the same tract of 30 acres of land in Guadalupe County, the first dated May 29, 1902, being given to secure a debt due by Sam Freeman, Jr., to Gray, the latter to same trustee to secure the same debt. The ground of cancellation of the first deed of trust was that Sam Freeman, Jr., had no interest in the land, and the second that A. A. Gray and Theo. Gibbs, his agent, had procured its execution by threats to imprison Sam Freeman, Jr., if the debt incurred by him was not secured. Sam Freeman, Sr., died pending the

suit and his son George Freeman intervened claiming to have purchased the land from his father and setting up the same grounds for cancellation of the deeds of trust. A trial by jury resulted in a verdict and judgment for appellee. This appeal is being prosecuted by Gray and Taylor. They complain only of the cancellation of the deed of trust given by Sam Freeman, Sr.

We find that on May 28, 1903, A. A. Gray, who resides in Bexar County, Texas, in company with Theo. Gibbs, his agent and attorney, went first to the residence of Newt Dibrell, in Guadalupe County, seeking for Sam Freeman, Sr. The wife of Newt Dibrell was the daughter of Sam Freeman, Sr. Not finding him there, Gibbs told Newt about Sam Freeman, Jr., having procured money from Gray by representing that he was the owner of the land in controversy, and that he had committed a penitentiary offense. Newt although greatly disturbed would not agree to stand for the debt but told Gray and Gibbs where Sam Freeman, Sr., could be found in Gonzales County. They sought and found the elder Freeman, who was a blind negro over seventy years old. Gibbs led him off to a secluded spot and told him that his son had committed a penitentiary offense and by promising his son immunity from punishment if the debt was secured, so worked on the fears of the weak old man that he executed the note, and mortgage on the land. Gibbs took the acknowledgment to the instrument, which was signed by the mark of the old man as he could neither read nor write. Sam Freeman, Sr., gave appellee a deed to the land.

It would be interesting, if not instructive, to follow the law as to duress by putting in fear from its early conception, when the rigorous test of what a man of courage would do under like circumstances was applied to every individual, down through its successive steps to the modern theory that there can be no legal standard as to the power to resist wrong and oppression, but that every case must be judged by the parties to it and the facts and circumstances surrounding it. There has been manifested a remarkable tenacity, upon the part of courts, to adhere to the doctrine of a legal standard and the ancient rule though modified and changed from the standard of resistance of a courageous man to that of a man of ordinary firmness, is still adhered to in some courts. Again it has been held that mere threats of a criminal prosecution do not constitute duress unless there is a threat of immediate and unlawful imprisonment. This doctrine has been also modified and it is held that the guilt or innocence of the wronged party, or the lawfulness or unlawfulness of the threats are immaterial.

Speaking on this subject, in the case of Ins. Co. v. Kirkpatrick, 20 So. Rep., 651, the Supreme Court of Alabama said: "It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due, or to coerce the making of contracts or agreements from which advantage is to be derived by the party employing such threats. Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different pur-

pose, and can not be employed to interfere with that wise and just policy of the law that all contracts and agreements shall be founded upon the exercise of the free will of the parties which is the real essence of all contracts."

In the case of Galusha v. Sherman, 81 N. W. Rep., 495, 47 Law Rep. Ann., 417, the question of duress is discussed by the Supreme Court of Wisconsin in an able manner, and after following the history of the evolution of the position of courts on the subject, the modern doctrine is thus forcibly and clearly stated. "The making of a contract requires the free exercise of the will-power of the contracting parties, and the free meeting and blending of their minds. In the absence of that, the essential of a contract is wanting; and if such absence be produced by the wrongful conduct of one party to the transaction, or conduct for which he is responsible, whereby the other party for the time being, through fear, is bereft of his free will-power, for the purpose of obtaining the contract and it is thereby obtained, such contract may be avoided on the ground of duress. There is no legal standard of resistance which a party must exercise at his peril to protect himself. The question in each case is, was the alleged injured person, by being put in fear by the other party to the transaction for the purpose of obtaining an advantage over him, deprived of the free exercise of his will-power, and was such advantage thereby obtained? If the proposition be determined in the affirmative, no matter what the nature of the threatened injury to such person, or his property, or the person or liberty of his wife or child, the advantage thereby obtained can not be retained. The idea is that what constitutes duress is wholly a matter of law and is simply the deprivation by one person of the will-power of another by putting such other in fear for the purpose of obtaining, by that means, some valuable advantage of him. The means by which that condition of mind is produced are matters of fact, and whether such condition was in fact produced is usually wholly matter of fact, though of course the means may be so oppressive as to render the result an inference of law. It is a mistaken idea that what constitutes duress is different in case of an aged person or a wife or child than in case of a man of ordinary firmness. . . . The means used to produce that condition, the age, sex and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will-power. Obviously what will accomplish such result can not justly be tested by any other standard than that of the particular person acted upon. His resisting power, under all the circumstances of the situation, not any arbitrary standard, is to be considered in determining whether there was duress."

The language quoted, we think, gives the law correctly and it is sustained by ample authority. Perkins v. Adams, 17 Texas Civ. App., 331; Obert v. Landa, 59 Texas, 475, 78 Texas, 33; Bank v. Sargent (Nev.), 91 N. W. Rep., 595; Bond Assn. v. Klee (Neb.), 97 N. W. Rep., 476; Cribbs v. Sowle (Mich.), 49 N. W. Rep., 587; Taylor v. Jacques, 106 Mass., 291; Bryant v. Peck, 154 Mass., 460; Schoener v. Lissauer (N. Y.), 13 N. E. Rep., 741; Parmentier v. Pater (Ore.), 9 Pac. Rep., 59;

Earle v. Hosiery Co. (N. J. Eq.), 192; Adams v. Bank, 23 N. E. Rep., 7.

Under the law of duress by putting in fear, a man's child stands in the same situation as himself, and fear of the imprisonment of a child will destroy the free agency of the parent and the agreement he makes under such circumstances can not be enforced in a court of equity. Love of offspring is inherent in the human race and an appeal to the fears of the parent in connection with the safety of the child attacks him in the weakest and most vulnerable point. Bank v. Kusworm (Wis.), 59 N. W. Rep., 564. The case is also reported in 26 L. R. A., 48, where it is fully annotated.

Coming now to consideration of the errors assigned by appellants, we hold that the petition states a cause of action and that it was not subject to a general demurrer. The circumstances surrounding the father of appellee are fully set forth and it is alleged that appellee had a deed from his father to the land. The contention that a purchaser could not prosecute the suit, we think, is untenable. To hold otherwise would be to say that Sam Freeman, Sr., had rights in the land but that he could not assign them. Such is not the law of Texas. The rule is that mere personal actions, such as for slander, libel, assault and battery, false imprisonment, etc., die with the party, but when the injury affects the estate rather than the person the action for it may be assigned, and the purchaser can prosecute the action. Galveston, H. & S. A. Ry. Co. v. Freeman, 57 Texas, 156; Carder v. McDermott, 12 Texas, 546; Winn v. Railway Co., 12 Texas Civ. App., 200, 33 S. W. Rep., 593.

In the case of Carder v. McDermett, above cited, in discussing the right of a party to sell his land from which he had been ousted, it was said: "Does there exist in the nature of real property any such qualification of the right of alienation or has any such principle of law been recognized in this state, as would deprive an owner, who has been ousted from possession of the power to sell and convey such rights as he may have in the property? If there be, it would seem (strange as it may appear) that the legal effect of an outrage (even to expulsion from possession) would be to impair also the right in the property itself, at least so far as to deprive the owner of the previously existing power of alienation, and thus the wrong of the disseizor would, instead of being alleviated, be aggravated by the additional wrong inflicted by the law. The unfortunate owner, deprived of possession and the power of sale together, would be compelled either to surrender his rights, or involve himself in vexations and harassing litigation, and thus at the caprice of every marauder, he might be expelled from his habitation, and deprived of even the miserable right of selling his property and enjoying the proceeds in peace. Certainly there can not exist in the subject matter of any property any such principle as would, because a wrong has been perpetrated by a malefactor, inflict another by operation of law. Nor has any such legal principle been recognized in this state."

So in this case an old man has had his land taken from him without consideration under fear of imprisonment of his son, and when he transfers his title to another son in order that he may have a competency

for his last days, the laws of Texas do not support the monstrous proposition that his right to cancel the conveyance obtained under duress dies with him and a purchaser from him has no right or authority to prosecute the suit begun by him. To so hold would be to place a premium on fraud and allow it to speculate on the frailty of human life. Whatever rights the father had in the land he could and did convey to his son. Lee v. Salinas, 15 Texas, 495.

That part of the petition alleging that the facts connected with the execution of the mortgage to appellant Gray, were imparted by Sam Freeman, Sr., to appellee should, perhaps, have been stricken out on appellants' exception that it was hearsay and immaterial, but it does not follow that the error in not sustaining appellants' exception can be made available in obtaining a reversal of the judgment, for the reason that it must appear, that the failure to sustain it resulted in injury to appellants. We do not think that it so appears. It is true that under the objectionable allegation appellee testified that Sam Freeman, Sr., told him that he had executed a mortgage to Gray and the circumstances under which it had been executed, but however objectionable the evidence may have been it could not have injured appellants for the simple reason that all of the testimony independent of that evidence tended to show that Sam Freeman, Sr., was under duress at the time the mortgage was executed. Take for instance the testimony of Theo. Gibbs, the attorney of Gray, who obtained the mortgage: "On the 28th day of May, 1903, I prepared the deeds of trust of said date, covering property described in intervener's petition, and signed by Sam Freeman, Sr., to secure a note for $242 payable to A. A. Gray, agent, J. M. Taylor, trustee. On the day the deed of trust was written, I went in company with A. A. Gray, to the house of Newt Dibrell, about eight miles from Seguin, expecting to find Sam Freeman, Sr., there. . . . We left Newt's and went to C. W. Clark's and found Sam Freeman, Sr., there. I led Sam Freeman, Sr., out and sat down on some logs behind a crib, some 20 or thirty steps from the house, and told him of the situation as it had been detailed to me by Mr. Gray. I told him there was no desire or intention on the part of Mr. Gray to prosecute his son and that if he was willing to pay the debt, Mr. Gray would be very grateful. Sam Freeman asked me what the penalty was for the offense, and I told him it was a penitentiary offense. He asked me if he gave a note to secure the money, with a deed of trust, whether his boy would be sent to the penitentiary. I told him I didn't know, but I was sure that Mr. Gray would not go out of his way to prosecute him. Sam Freeman, Sr., then agreed to give a note for the amount then due, and let his land stand for it, if Mr. Gray would give him a long time in which to pay it. . . . I then led him back to the gallery and went to my buggy and got ink, pen and paper and returned to the gallery, and stated to Mr. Gray what Sam had expressed a desire to do, and told him the old man wanted a note payable some years hence, and wanted to know what rate of interest he would charge. . . . I wrote the deed of trust and then looked it over to see that it was correct. I then read it in full to Sam Freeman, Sr. . . . I told Sam Freeman, Sr., out at the barn that his son was guilty of a penitentiary offense, but I said to

him that I knew Mr. Gray personally, that he had not expressed any desire or intention of prosecuting his son, and that I knew he did not want to. Then after that I told him how he could arrange the matter so that Mr. Gray would not lose the money he had loaned to Sam Freeman, Jr., and Sam Freeman, Sr., seemed to think that if he arranged the matter Mr. Gray might send him to the penitentiary, and I told him that Mr. Gray would not go out of his way to prosecute Sam Freeman, Jr." Gray swore that he told Gibbs in effect that young Freeman had obtained $220 from him by representing that he owned the land that belonged to his father, and Gibbs narrated those facts to the old man and told him that the facts made a penitentiary offense and there was a covert threat in what he said that if arrangements were not made to pay the note the young man would be sent to the penitentiary. It was intended as a threat, and it operated as a threat in causing the old man to do as was desired by appellants. That the language conveyed to him a threat to prosecute the young man if the note was not secured and promised immunity if it was done, is shown by the old man's expressed anxiety that Gray might prosecute after he got the security and he was assured that "Mr. Gray would not go out of his way to prosecute" if the mortgage was given. The testimony of Gibbs, which was introduced by appellants, sustained every material allegation of the petition. It would sustain the verdict independent of all the other testimony.

It is true that the petition alleged direct threats upon the part of appellants to put young Freeman in the penitentiary if the old man did not give the mortgage and while Gibbs denied making the threats masked threats were conveyed not only in his language but every act. Together with his principle he had gone to another county, had sought the old negro, a former slave, poor, ignorant, aged and blind, had led him away where the full influence of his language might not be lessened by the presence of others and the result was the giving of a mortgage for a debt in which he could have no interest except to save his erring boy from a felon's cell.

In a note to the case herein cited of Bank v. Kusworm, the following apt language is taken from an English decision which, we think, expresses the law of this case: "If a father is appealed to, to take upon himself a civil liability, with the knowledge that unless he does so his son will be exposed to a criminal prosecution with a moral certainty of conviction, even though that is not put forward by anyone as a motive for arrangement, he is not a free and voluntary agent and the agreement he makes under such circumstances is not enforceable in equity." Williams v. Bayley, L. R. 1 H. L., 200, 35 L. J. Ch., 717, 12 Jur. N. S., 875, 14 L. T. U. S., 802.

In the case of Bond Ass'n v. Klee, above cited, a son-in-law of Klee was short in his accounts and the appellant in the conversation with appellee had said something about sending the son-in-law to the penitentiary and under those circumstances he signed the note that he afterwards repudiated. The Supreme Court of Nebraska sustained a judgment of the trial court in favor of the maker of the note on the ground that the evidence showed that he was under duress. In that case there

was no evidence  an open, direct threat to imprison the son-in-law, but merely something was said about it, and that was held to be a masked threat.

In the case of Adams v. Bank, above cited, the wife executed a note to the bank for a debt due by her husband, the superinducing cause being that she had heard that her husband would be arrested for the debt. She asked the vice president of the bank if her husband had committed any crime and he replied in the negative, but that any man could be arrested, and asked her how she would like for her husband to be arrested on Saturday night, too late to obtain bail. There was no direct threat, but the New York Court of Appeals held that a judgment of the trial court cancelling the note should be affirmed, saying: "The principle which appears to underlie all of this class of cases is that, whenever a party is so situated as to exercise a controlling influence over the will, conduct and interest of another, contracts thus made will be set aside."

The allegations and proof as to what the consideration was for the execution of the deed by Sam Freeman, Sr., to appellee, were utterly immaterial and could not have injured appellants. The deed itself recited a consideration and there was no call for any further proof in regard to the consideration. The charge which required proof of the conversations and oral agreements with Sam Freeman, Sr., required of appellee proof of matters that placed a burden on him that he should not have borne and appellants have no cause for complaint.

Appellee was allowed, over the objection of appellants, to prove that there was an agreement between him and his father in which the latter agreed to prosecute the suit for his son, and appellee agreed to clothe him, give him a home and take car of him during his life. This was objected to on the grounds that it was an attempt to show a different consideration from that recited in the deed, was a contract to be performed in the future, was without pleadings to support it, and because it contradicted the recitals in the deed. None of those objections was well taken. Proof of the matters in question could not in any event have injured appellants.

Appellants objected to proof of a conversation had between Newt Dibrell and his wife and Gibbs and Gray on the day that they were hunting and found Freeman, Sr., and secured the mortgage, the objection being that the conversation was not made known to Freeman, Sr. Newt Dibrell's wife was the daughter of Freeman, Sr., the latter was dead and Gibbs was the only witness to what was said by him to the deceased. It was permissible to show the statements of Gibbs and Gray a short time before the execution of the mortgage, to other members of the family as tending to show what they probably said to Freeman, Sr. However, there was nothing said to have been stated by Gibbs or Gray, that the former did not admit that he had said to Newt Dibrell. The statement made by Newt Dibrell to his wife in the presence of Gray and Gibbs that if they did not fix the matter up Gibbs and Gray would send young Freeman to the penitentiary was permissible. It showed the impression that had been created on the minds of the members of the family that had been asked to arrange the debt due by young

Freeman. Gray swore that Newt Dibrell refused to pay the debt, but said that the old man would. The conversation showed a concerted plan to coerce the members of the family into paying the debt of young Freeman by threats of imprisoning him.

The 12th assignment of error has no foundation in fact as Newt Dibrell did not testify as to any change in the date of the mortgage. The evidence was, however, given by A. W. Dibrell and Eringhaus, the evidence of the first being objected to because there was no allegation in the petition that the deed of trust had been changed, and of the second because it was an attempt to impeach Gibbs on an immaterial matter. It was specifically alleged in the supplemental petition that the note had been materially changed after its execution, and it was proper to show that the date of the deed of trust had been altered after its execution as tending to show that the note had been changed also. The testimony was not on an immaterial matter and was proper as tending to contradict Gibbs who swore that the change in the note was made before its execution.

The deed from Sam Freeman, Sr., to George Freeman was properly admitted in evidence. It made no difference whatever as to what the consideration was that passed between them, and appellants could not possibly be affected by that consideration. There was no variance between the allegations as to the consideration and the proof, and if there had been it was a matter of which appellants could not meritoriously complain.

The sixteenth assignment of error complains of the admission in evidence of the original petition in the case filed by Sam Freeman, Sr., sufficient answer to that complaint is that the petition was not placed in evidence, nor was any attempt made to introduce it. All that was done was to place in evidence the date of its filing. There could have been no error in that.

The seventeenth assignment of error is without merit. One of the jurors became sick during the trial and he was excused by agreement of counsel for both parties, and under such circumstances it is not necessary that the remaining eleven jurors should sign the verdict, but it is proper for it to be signed by a foreman as when there are twelve jurors. If the juror had died or had been disabled the remainder of the jury could have returned the verdict, but all the remaining jurors should have signed the verdict. Art. 3229, Sayles' Stat. But parties can agree that a case can be tried with a less number than twelve, and in such case it is not necessary that all should sign the verdict. Art. 3228, Sayles' Stat; Train Lumber Co. v. Hancock, 70 Texas, 312.

There is no merit in the contention that if Sam Freeman, Sr., executed a deed of trust for the purpose and with the understanding that his son should not be prosecuted, that the agreement amounted to the compounding a felony. Under the criminal law of Texas he is guilty of compounding a crime who agrees with the offender, either directly or indirectly, not to prosecute or inform on him in consideration of money or other valuable things paid, delivered or promised to him by such offender, or other person for him. Art. 291 Penal Code. Under

that definition Gray and Gibbs might be guilty of compounding a crime, but Sam Freeman, Sr., could not be.

But if Sam Freeman, Sr., had been guilty of compounding the crime of his son that would not prevent him from annulling the contract. The plea of compounding a crime comes with a poor grace from those who have been the active agents in bringing it about, and the law will give but little heed to it. The law lends itself to him who would destroy an unlawful contract and only refuses to have anything to do with the matter when both parties are equally guilty and an enforcement of the illegal contract is sought. Lewy v. Crawford, 5 Texas Civ. App., 295, 23 S. W. Rep., 1041.

The doctrine stated in special charge No. 2 asked by appellants had no application to the facts of this case. It may be that if a party guilty of a crime, in fear of punishment, executes a contract in order to make reparation for his crime, that he will be bound by it, but that principle could have no application to a third party who acts because he fears the punishment of another. The distinction between the two cases is apparent and too clear for discussion. The authorities cited by appellants do not support their contention.

The court did not assume that any threat was made, but left the jury free to decide upon that point and it was not error to instruct the jury that if they found "from the evidence such representation or threat, if any, exercised a controlling influence over the will of the said Sam Freeman, Sr., and that he was induced by such threat to execute said deed of trust, and that without said threat he would not have executed the same, you will find for the plaintiff." That expressed the law of the case, as hereinbefore fully set forth. If the threat induced the execution of the mortgage, and he would not have executed it without such threat, his will power was destroyed and he was not a free agent in the execution of the mortgage.

The case of Loud v. Hamilton (Tenn.), 51 S. W. Rep., 140, is cited as authority in this case and it is claimed that it presents a more meritorious case than this and yet the court held there was no duress. A mere statement of the facts of that case refutes the contention. Murphy, the son-in-law of Hamilton, was arrested for embezzlement, his wife telegraphed to her father about the trouble and asked him to come. Hamilton went and agreed to make good the amount and gave his notes for the indebtedness. Hamilton deliberated quite awhile before executing the notes and his daughter offered to give up her interest in his estate if he would execute the notes and then he afterwards fully ratified the contract. He was a man of intelligence and on a plane of equality with the parties with whom he dealt. That case does not seem to meet the case of two white men, both of them educated and intelligent, one a lawyer, following an old, weak, decrepit, blind ex-slave into another county and taking him away from everyone so to work on him through his love for a wayward son, as to cause him to mortgage his little home of thirty acres of land, all that he had on earth, in order to secure his son immunity from punishment. Weak and tottering upon the verge of the grave he was, as clay in the hands of the potter, easily molded to suit the desires of those who had followed him from the

county of his residence to another for the purpose of accomplishing exactly what they did accomplish. If in the hands of the persuasive agent of the principal who accompanied him, the blind old negro was a free agent, then the free agency of mankind is invulnerable and irresistible, and human fears can not be aroused by the threatened imprisonment of loved ones.

No errors requiring a reversal are presented and the judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

The only objections urged to the testimony of Newt Dibrell, as to what he stated to his wife in the presence of Gray and Gibbs, were that it was immaterial and prejudicial and that the statements were not communicated to Sam Freeman, Sr. Newt Dibrell had sworn that Gibbs had taken him aside and told him about Sam Freeman, Jr., and it was material that it be shown that the statements of Gibbs were authorized by his principal. This was shown by the fact that what the mission of Gibbs and Gray was was told in the presence of Gray and he made no objection but instead joined Gibbs in asking the witness to arrange the matter for Sam Freeman, Jr. It is the rule that great latitude is allowed in the admission of evidence in cases of fraud and evidence of collateral transactions or other acts than the one directly in question are often permitted. Other fraudulent representations to the defrauded party, or even to third persons are admissible when so connected or part of a general scheme to defraud as to show knowledge, intent or design. Elliott Ev. sec. 184. The case of Harris v. Tyson (Penn.), 64 Am. Dec., 661, cited by appellants is not in point. The facts in that case are not at all similar to those in this. This court has not held that what Gray may have said to different parties about matters not directly connected with the fraud alleged, could be proved. The court in Harris v. Tyson very properly held that declarations, made by the party charged with fraud, in regard to lands other than that involved in the suit were not admissible.

The case of Largent v. Beard (Texas Civ. App.), 53 S. W. Rep., 90, from which appellants state that they copied their special charge No. 2, is so clearly distinguishable from this that we did not deem it necessary to discuss it, to any extent, in our former opinion. In that case it seems that the evidence tended to establish that Manly Beard executed the note to Largent, sought to be set aside on account of duress, because he had taken and appropriated money or property belonging to Largent Bros., and, although induced to make the note by the conduct and declarations of Largent, he executed it in consequence of conscious guilt or from a fear of legal punishment and in order to make reparation, and the court held that the jury should have been charged that if those facts existed a verdict should be rendered for defendant. If this had been a suit between Sam Freeman, Jr., and appellants the charge might have been applicable, but it can not apply to the facts of this case.

While there are expressions in the motion for rehearing that might

indicate that appellants are not satisfied with our conclusions of fact no clear objection is urged thereto. Another consideration of the statement of facts does not change the opinion of this court as to its being sufficient to justify the verdict.

Although no complaint is urged in the motion against the ruling of this court to the effect that Sam Freeman, Sr., had the right to assign to appellee whatever rights he may have had in the land, and that his assignee could maintain a suit to set aside a former deed, we have again considered that subject and find that it is sustained by ample authority. In the case of McMahon v. Allen, 35 N. Y., 403, the subject is fully discussed and authorities reviewed and the court arrived at the conclusion that an assignee of land can maintain a suit to set aside a deed obtained from his assignor through fraud. The motion is overruled.

*Overruled.*