HOUSTON ICE & BREWING CO. et al. v. HARLAN et al. (No. 408.)

(Court of Civil Appeals of Texas. Beaumont. May 13, 1919.)

1. TRIAL ⊙⟶133(1)—ARGUMENT OF COUNSEL— DUTY OF DISTRICT JUDGE.

In view of rules 39, 40, 41, for the district and county courts (142 S. W. xx), requiring that counsel confine their arguments strictly to the evidence and to the argument of opposing counsel, it is duty of district judge to keep counsel within the record, and not to jeopardize appellants' rights by inferentially sanctioning highly wrought and inflammatory argument.

2. APPEAL AND ERROR ⊙⟶1060(1)—HARMLESS ERROR — ARGUMENT OF COUNSEL — MATTERS OF RECORD.

In suit by married woman to set aside general warranty deed executed by herself and husband to a defendant, on ground that it was a mortgage, and had been executed under duress to prevent jailing of husband by a defendant for embezzlement, plaintiff's inflammatory argument, discussing in strong language matters not in evidence or based on matters not supported by evidence, was reversible error, especially where evidence was circumstantial, and jury found against defendant.

3. APPEAL AND ERROR ⊙⟶1060(1)—IMPROPER ARGUMENT—REVERSAL.

Improper argument alone is sufficient to reverse the case.

Walker, J., dissenting.

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

Suit by Clara J. Harlan against Houston Ice & Brewing Company and others, wherein the plaintiff's husband was made a party plaintiff by defendants. Judgment for plaintiffs, and defendants appeal. Reversed, and remanded for a new trial.

Barry & Burges, and Orgain, Butler, Bolinger & Carroll, all of Beaumont, for appellants.

Geo. C. O'Brien, W. R. Blain, and R. L. Durham, all of Beaumont, for appellees.

WALKER, J. The appellee Mrs. Harlan filed this suit in the court below against the appellants to set aside an instrument in the form of a general warranty deed, executed by her and her husband to Houston Ice & Brewing Company, of date 12th day of September, 1914. Her husband was not joined in the petition, she alleging that he refused to join. However, he was made a party plaintiff by the defendants. The plaintiff alleged in her petition and in her supplemental petition that the instrument was a mortgage given by her and her husband to secure an indebtedness due by her husband to the Houston Ice & Brewing Company in the sum of about $2,000, and, if she was mistaken in this allegation, then she further alleged that she executed the instrument under duress, the Houston Ice & Brewing Company threatening to put her husband in the penitentiary for embezzling funds unless she joined him in the execution of this instrument.

The defendants answered denying the allegations of the plaintiff, pleading specially that the instrument was a general warranty deed given by the plaintiff and her husband in payment of $2,578.65 on his shortage with them, leaving a balance due of $96.42, and, if the instrument was executed under duress, further pleading estoppel against plaintiff, alleging that she had rented the property from them at $20 per month for two months.

The case was submitted to the jury on special issues, and in answering the same the jury found that the instrument was a mortgage, and they further found that it was executed by Mrs. Harlan under duress. On these findings the court entered judgment for plaintiff for the title and possession of the land, canceling the deed of date the 12th day of September, 1914.

By proper assignments appellants complain because the court did not instruct a verdict for them on the issue of mortgage, and they also complain of the submission of this issue to the jury, and of the finding of the jury on this issue.

Reviewing the facts in this case, we find that Mrs. Harlan testified that her husband, P. E. Harlan, told her that he was short with the Houston Ice & Brewing Company, and that they had required him to settle with them, and had threatened to turn him

over to the bonding company unless he did so; that he had no property to use in this settlement except their home, and that it was necessary for them to deed this home to the Houston Ice & Brewing Company, as security for this shortage; that if they did this the company would give them a chance to redeem it, and unless they did so he would be turned over to the bonding company and be prosecuted, and would have to go to the penitentiary; that he had just had a talk with Mr. Autry at the Crosby Hotel, and Mr. Autry had told him that he could not hold the matter open any longer; that she thought about the matter several days, and she and her husband had the instrument prepared, and they signed and acknowledged it; that she and her husband went over to Houston to see Mr. Autry, and took the instrument with them; that she wanted to be convinced that her husband was short with the company before she delivered the instrument; that she told Mr. Autry all that her husband had told her, and asked him if her husband was really short; that Mr. Autry told her that he was; that she further asked him if he would be turned over to the bonding company and prosecuted and put in the penitentiary if she did not sign the instrument, and that she did not remember what answer Mr. Autry made her; that thereupon she and her husband delivered the instrument to Mr. Autry; that Mr. Autry agreed with her that the property could be redeemed, and, if he could sell the property for more than her husband's shortage, he would pay the balance to them, and that he was holding the instrument as security for Mr. Harlan's indebtedness. She further testified that either on that trip, or on a subsequent trip, she rented the property from Mr. Autry and paid two months' rent; that she had claimed the property as her home all the time, and had been living on the property since the execution of the deed, and that the defendants had never been in possession of any part of it; that she wrote the following letter:

"Mr. R. L. Autry, Sr., Houston Ice & Brewing Co.:

"As I promised to send $20 for rent, cottage 1408 Liberty avenue, Beaumont, will find inclosed amount of same, but you did not state what month to begin with. Will ask you to mail the return receipt to me 1408 Liberty avenue and oblige."

That she also wrote this letter:

"January 2, 1915.
"Mr. R. L. Autry, Sr.:

"Inclosed find $20 for rent December, 1914, on cottage 1408 Liberty avenue, Beaumont, Texas. I did not get it off yesterday on account of the post office being closed here. I trust that it is not troubling any one, and will try and not let it be repeated. There was a party said that they would like to get the property on Liberty. I did not mention this place until I notified you, and don't know if this place was for sale. Again I apologize for not getting this a day sooner than a day late."

The following letter was introduced by defendant:

"Houston, Texas, Dec. 5, 1917.
"Mr. P. E. Harlan, Beaumont, Texas,

"Dear Sir: We inclose a statement of your account. You will observe that the balance, after crediting you with the amount which we agreed to allow you for the deed, is $2,675.07, and, after allowing credit for the deed of $2,578.65, the amount agreed upon, there is a balance of $96.42, which is due.

"Mrs. Harlan sent us about the first of the month a postoffice money order for $20.00, which covered the rent of the property described in the deed, 1408 Liberty avenue, Beaumont, for the month of November, and we wrote her December 3d, in acknowledging receipt of the rent, that the rent for December could be paid on the first of January. We are to-day paying the remaining unpaid notes of the series of 61 notes given by you to John R. Callahan in part payment of the property, and we wish to have a statement from you and Mrs. Harlan confirming the terms on which we are renting the property.

"These are that you will rent the property from month to month at $20.00 a month, the renting to be terminable by either us or yourselves at the end of any month, and you to surrender possession of the property at that time. The next installment of rent, which is for the month of December, as stated, will be due on the first of January, 1915.

"We send you a carbon copy of this letter, and request that you sign and acknowledge the indorsement which is written on it, and have Mrs. Harlan do the same, and then return it to us.

"Yours very truly."

"We, P. E. Harlan and Mrs. Clara J. Harlan, hereby acknowledge that the amount credited above, $2,578.65, is the true and correct amount which the Houston Ice & Brewing Company agreed to allow P. E. Harlan on his indebtedness to that company for the deed dated September 12, 1914, to the property which was formerly our home, being 1408 Liberty avenue, Beaumont, and we acknowledge that the balance owing by Mr. Harlan to the Houston Ice & Brewing Company, after allowing this credit of $2,578.65, is $96.42, and that this latter amount is justly due. We also acknowledge that the rent has been paid for the month of November only, and we agree to pay the Houston Ice & Brewing Association $20.00 per month rent for said property as long as we occupy the same, the rent to be paid on or before the first day of each month for the month preceding, and agree to vacate the same at the end of any month when notified or requested by the Houston Ice & Brewing Association so to do.            P. E. Harlan,
                    "Mrs. Clara J. Harlan."

This indorsement was duly acknowledged by plaintiff and her husband in the form and manner required by law to bind a married

woman in the conveyance of her homestead.

P. E. Harlan, the husband of plaintiff below, testified on direct examination that the instrument was executed as security for his shortage with the Houston Ice & Brewing Company, but on cross-examination he testified:

"When I used the word "security' I meant it was to wipe out and extinguish the debt and to get rid of it. It was to get rid of the debt. When I took the deed over to Mr. Autry I supposed that would settle the whole thing and settle the account."

When Mr. Autry testified that it was a bona fide sale; that Mr. Harlan was short in his account, and he took this property in settlement of $2,578.65 of the debt, leaving a balance of $96.42; that the instrument was in no way intended as a security for the shortage or for any part of it; that Mrs. Harlan never saw him but once, and that she did not say to him, nor did he say to her, that the property was taken as security for the debt. From her manner of testifying, we further find that Mrs. Harlan was a very intelligent woman, and, so far as shown by the record, she was in good health during the time covered by this transaction.

While Mrs. Harlan testified that she executed this instrument as a mortgage to secure the shortage of her husband, not only her testimony as a whole, but all the testimony in this record, convinces us that all the parties, at the time of the execution of this instrument, intended the same as an absolute conveyance.

To show that a deed, absolute on its face, is intended as a mortgage, the testimony must be clear and satisfactory. In support of this proposition, we cite Mitchell v. Morgan, 165 S. W. 883; Frazer v. Seureau, 128 S. W. 649; Goodbar & Co. v. Bloom, 43 Tex. Civ. App. 434, 96 S. W. 657; Rotan Grocery Co. v. Turner et ux., 46 Tex. Civ. App. 534, 102 S. W. 932; Stringfellow v. Braselton, 54 Tex. Civ. App. 1, 117 S. W. 204; Smith et ux. v. Eastham, 56 S. W. 218; Wedgeworth v. Pope, 196 S. W. 621. This legal proposition has been before our courts so often that it will serve no good purpose to review these authorities. Having carefully reviewed all the testimony in this record, we find that the verdict of the jury holding that this instrument is a mortgage cannot be sustained under the settled authorities of this state.

Issue No. 1, submitted to the jury, is as follows:

"Do you find from a preponderance of the evidence that the grantors, P. E. Harlan and wife, Clara Harlan, and the grantee Houston Ice & Brewing Company, through its agent R. L. Autry, at the time of the execution and delivery of said deed, intended the same as a mortgage, or do you find that they intended the same as a deed?"

To this question the jury answered, "Mortgage."

Issue No. 2 is as follows:

"Do you find from a preponderance of the evidence that, in order to induce the plaintiff Mrs. Harlan to sign said deed, her husband, P. E. Harlan, prior to her signing the same, represented to her that unless she did sign said deed that criminal prosecution would be instituted against him, and that he represented to her that the said R. L. Autry had claimed that he, P. E. Harlan, was short in his accounts with the Brewing Company, and, further, that he represented to her that it was necessary for her to join in said deed as the only means of preventing such prosecution?"

To this question the jury answered, "Yes."

Issue No. 3 is as follows:

"If you shall answer 'No' to issue No. 2, then you need not answer any following issue, but if you answer 'Yes' thereto, then you are asked:

"Did the said Mrs. Harlan, at the time she executed said deed, believe said statements or representations made by her husband as inquired about in issue No. 2?"

To this question the jury answered, "Yes."

Issue No. 4 is as follows:

"Do you find from a preponderance of the evidence that such statements or representations made to Mrs. Harlan by her husband (if they were so made) so operated upon her mind or her fears or her emotions as to overcome her free mind and will in the execution of said deed?"

To this question the jury answered, "Yes."

Issue No. 5 is as follows:

"Do you find from a preponderance of the evidence (if you have found that such statements were made to the said Mrs. Harlan) that she, Mrs. Harlan, would not have executed said deed if such representations had not been made?"

To this question the jury answered, "Yes."

Issue No. 6 is as follows:

"Do you find from a preponderance of the evidence that R. L. Autry, at any time prior to the actual delivery of said deed to him, knew of the substance of the representations or statements made by P. E. Harlan to his wife, as inquired about in issue No. 2, if you find they were so made?"

To this question the jury answered, "Yes."

There is also complaint of the refusal of the court to give their peremptory instruction on the issue of duress, and they excepted to the submission of questions 2, 3, 4, 5, and 6, and to the answers of the jury thereto.

The testimony of Mrs. Harlan goes fully into the details of how and when and where this deed was executed, she testifying that she executed this instrument to secure this shortage of her husband, and that she would not have executed it to pay this shortage except for the fact that she wanted to save her husband from prosecution and disgrace; that she received nothing for it, and no bene-

fits from the same, except an understanding between her and the defendants that if she would execute it her husband would not be turned over to the bonding company, and would not be prosecuted, and that his embezzlement would not be exposed.

P. E. Harlan testified:

"Mr. Autry came over and told me something had to be done, and that was the only thing I had to offer. My account was overdrawn, and he said something had to be done, and the only thing I had to offer him was this property; so I told him I was willing myself to deed it over to him. * * * We were down at the hotel together, and I told him everything I had was the property, and then I got in a buggy and we took a look at it. After Mr. Autry's visit, I told my wife about it. * * * Mr. Autry gave me to understand that something had to be done immediately, and I told him it was all right. We were down at the hotel together, and I told him the only thing I had was the property, and then he got in a buggy, and we took a look at it. After Mr. Autry's visit I told my wife about it. It was that afternoon. I told her Mr. Autry had been over, and he said something had to be done, and that I didn't see any other way but that that property, we would have to give him the place. She didn't seem to be very well satisfied about it, and I said that was the only thing, and she said anything to help out she would be willing to do. I told her what Mr. Autry told me that is that I had to do something right away, and she said it was about the best we could do. * * * Mr. Autry came over, and he told me something had to be done immediately."

On the 19th of February, Mr. Autry wrote the following letter to Mrs. Harlan:

"Houston Ice & Brewing Ass'n, Successors to Houston Ice & Brewing Co.

"Houston, Texas, February 19, 1915.
"Mrs. P. E. Harlan, 1408 Liberty Ave., Beaumont, Texas:

"Dear Madam: I have your letter dated February 10th. Our actions in dealing with Mr. Harlan speaks for itself better than words and promises.

"We admonished him often that he was not treating our company right, and not handling our business satisfactorily, and though he disregarded all warnings and all the advice given him, we continued to keep him in his position, paying him a stiff salary for many months. He is a man of wide experience, and if he now complains about have been given too much money to spend, and thereby being tempted to do wrong, he is playing a baby act that nobody can look upon with approval.

"When we agreed to take your former home property it was done to save him from disgrace because of his misappropriation of funds. We were very willing that he should sell the property elsewhere, and turn the proceeds over to us, and only took the property when he stated he had exhausted his efforts to sell it. Not only were we always willing to save him from loss, to to-day, if we could do him any substantial good, both Mr. Hamilton and I would be willing to do it, and the only question with us is whether he can utilize, and is willing to utilize, anything we may do for him. You know it is impossible to help a man against his will; in fact, he has to do most of the helping himself, and all we can do is to lend our support.

"For you personally I am very sorry, and you have my full sympathy.

"I am always glad to be of service, and remain
"Very respectfully,          R. L. Autry."

Appellants concede, in their fifth assignment of error, that the moving cause for the execution of this instrument by Mrs. Harlan was—

"she did it for the purpose of saving her husband, P. E. Harlan, from disgrace, measuring as against the latter the loss of her home and the giving it up for the purpose of saving the good name of herself and husband, and that she stated after days of deliberation that she had decided it was best, all things considered, to execute said deed, and thereby save her husband from disgrace."

We have carefully examined the statement of facts, and we find that the submission of issues 2, 3, 4, 5, and 6 was not error on the part of the court, but that the testimony called for the submission of the same; hence we adopt questions 2, 3, 4, 5, and 6, and the answers of the jury thereto, as our findings of fact on the issue of duress.

As to what constitutes "duress" in this state has been before our courts several times. Diller v. Johnson, 37 Tex. 47; Landa v. Obert, 45 Tex. 547; Obert v. Landa, 59 Tex. 475; Landa v. Obert, 78 Tex. 33, 14 S. W. 297; Phelps & Johnson v. Zuschlag, 34 Tex. 380; McGowan v. Bush, 17 Tex. 199; Medearis v. Granberry, 38 Tex. Civ. App. 187, 84 S. W. 1070; Gray v. Freeman, 37 Tex. Civ. App. 556, 84 S. W. 1106; Perkins v. Adams, 17 Tex. Civ. App. 331, 43 S. W. 531; Shriver v. McCann, 155 S. W. 320; Burnett v. Continental State Bank, 191 S. W. 172.

In Landa v. Obert, 45 Tex. 547, supra, Judge Moore, speaking for the court, said:

"Now, it is well settled that the fear of imprisonment which constitutes duress is fear of illegal imprisonment or imprisonment under such circumstances as, if carried into effect, would amount to duress by force. Hence the mere fear of imprisonment from a lawful prosecution cannot possibly be regarded as duress."

This case was reversed, and on the second trial the trial court sustained a general demurrer to the allegation of duress. On appeal a second time (59 Tex. 475), the action of the trial court in sustaining a demurrer was held error, and the case was reversed. Briefly stated, the facts in the Landa Case are as follows:

Obert was working for Landa running a gin, which position he had held for many years. Landa accused Obert of misappropriating funds and of stealing from him. He employed his lawyers to go and see Obert and get a settlement from him. His attorneys went to Obert and told him that he was

short; that Landa had caught him in his shortage; that this shortage amounted to many thousands of dollars; and gave him a short while to settle, something like an hour, threatening to have him arrested and prosecuted for embezzlement if he did not settle. To save himself from this prosecution, Obert canceled notes that he held against Landa, paid him quite a large amount in gold, and promised to pay an additional amount. When the settlement was finally closed between Obert and Landa, Landa gave Obert a statement, promising to pay the money back if he should be convinced that Obert had not stolen from him as manager of his gin. Obert was afterwards indicted and prosecuted for this embezzlement, and was found not guilty. He then brought suit against Landa for a rescission of the contract and a recovery of the money that he had paid to Landa. On the first appeal the case was reversed. On the second appeal a general demurrer was sustained · to the allegations of duress, the Supreme Court saying:

"In such cases the question becomes one of consent, and it is whether the party made the agreement freely and advisedly, or was his consent obtained by the means just mentioned. In what has been said we have had reference to the case and the parties solely as they are presented in the pleadings of the plaintiff, and not as they may appear on the trial. As the judgment must be reversed, we may remark that on the former appeal the eminent judge who delivered the opinion appears to have adopted from the books, and to have applied to this case expressions which are properly applicable to a different class of cases. The language is as follows: 'There can be no pretense that the alleged threats import a purpose to make any unusual, harsh, offensive, or illegal use of the process, either civil or criminal, with which it is insisted appellant was threatened.'

"These expressions, as has already been shown, have their appropriate application to cases of imprisonment for debt, and others of a like character, if such there be, though they have been sometimes (and, as I think, inadvertently) applied to cases of a different character."

In Medearis v. Granberry, supra, Granberry instituted suit to recover nine acres of land against George Medearis and wife. The defendants answered, pleading that the deed was executed by them under duress, alleging that the same had been given in consideration that Granberry should not swear out a complaint and have their son, Stephen Medearis, arrested and tried for disposing of mortgaged property in Travis county, and that said consideration and no other prompted the execution of said instrument; that Granberry brought their son, Stephen Medearis, to their house, told them that Stephen had fraudulently disposed of property on which he had a mortgage, and that he was going to have Stephen arrested and sent to the penitentiary unless defendants made arrangements with them then and there to pay

said Granberry, and that under such threats from Granberry they executed the instrument to the land in question. In disposing of this case the court said:

"The court instructed the jury that among other defenses pleaded by Medearis and wife was that the instrument under which the plaintiff claimed title was executed for an illegal consideration, but that there was no sufficient evidence to justify a finding for Medearis and wife on that issue, and to find · in favor of the plaintiff thereon. The court also refused a special instruction relating to the subject of duress, and to the effect that if the deed from Medearis and wife to the plaintiff Granberry was procured by a threat to the effect that, if they did not execute the deed he would prosecute their son for the violation of a penal law, to find for them as against the plaintiff. The refused instruction, while not as full and accurate as it might have been, was substantially a correct statement of the law in general terms, and, in the absence of any instruction on that subject, it was error for the court to refuse to give it. The general rule is that, in order to avoid a contract on the ground of duress, the threat must be against the party seeking to avoid the contract. However, there are exceptions to that rule, and one of the exceptions arises out of the relation of parent and child. Either may avoid a contract made to relieve the other from duress. 10 Am. & Eng. Ency. Law (2d. Ed.) 330, and cases there cited. The plea interposed by Medearis and wife, quoted above, while not using the term 'duress,' and while very general in that respect, was sufficient, in the absence of a special exception, to present that issue, and each of the plaintiffs gave testimony tending to support the theory of duress."

In Gray v. Freeman, supra, the facts show that Sam Freeman, Sr., executed a deed of trust to A. A. Gray under the following conditions: Sam Freeman, Jr., had represented to Gray that he was the owner of a certain piece of land, and, by giving a deed of trust to Gray, had borrowed some money from him. On finding that the land belonged to Sam Freeman, Sr., Gray went to the old man, and told him that his son had committed a penitentiary offense, and, by promising his son immunity from imprisonment if the debt was secured, so worked on the feelings of the weak old man that he executed the note and mortgage on the land. The Court of Civil Appeals held that these facts constituted duress and sustained the judgment of the trial court in canceling the mortgage so executed. In reviewing many authorities on duress, Judge Fly in his opinion quotes with approval as follows:

"In a note to the case, herein cited, of Bank v. Kusworm [88 Wis. 188, 59 N. W. 564, 26 L. R. A. 48, 43 Am. St. Rep. 880], the following apt language is taken from an English decision, which, we think, expresses the law of this case: 'If a father is appealed to, to take upon himself a civil liability, with the knowledge that unless he does so his son will be exposed to a criminal prosecution, with a moral certainty of

conviction, even though that is not put forward by any one as a motive for arrangement, he is not a free and voluntary agent, and the agreement he makes under such circumstances is not enforceable in equity.'"

In Thompson v. Hicks, 100 S. W. 357, Chief Justice Fisher says:

"This is a suit by Thompson against Hicks to recover on a promissory note executed by the latter to the former, and to foreclose a lien upon a certificate of corporate stock given as collateral to secure the note. The defendant pleaded duress in the execution of the note, in that the plaintiff, in order to procure its execution and the transfer of collateral, threatened to prosecute him for making a false affidavit in a proceeding in bankruptcy. The court below instructed a verdict in favor of the plaintiff, unless the plaintiff's case was defeated by the defense of duress. Verdict and judgment below were in defendant's favor. * * * In the twelfth assignment, and in others, the charge of the court in defining 'duress' is criticized as being incorrect. The charge upon this question is substantially in accord with the rule announced in Gray v. Freeman [37 Tex. Civ. App. 556] 84 S. W. 1105, where many of the authorities upon this subject are collected."

In Shriver v. McCann, 155 S. W. 320, Justice Hendricks cites Gray v. Freeman, saying:

"If appellee intended to avoid the new contract, on account of its execution having been procured under duress of imprisonment, measured by the law for the consideration of that issue, his pleading is irresponsive to that question, and neither was such an issue submitted to the jury. Appellee alleged a threat of criminal prosecution, but the character of the offense was not even mentioned, nor sufficient circumstances negativing the idea of a freedom of contract. Judge Neill, quoting from the Supreme Court in the case of Perkins v. Adams, 17 Tex. Civ. App. 335, 43 S. W. 531, used this language as an expression of the rule: 'But it has been held by the Supreme Court, in cases where the threats of prosecution and imprisonment were made against the party sought to be held by the contract, that the rule to be deduced from the great weight of authority is that mere threats of criminal prosecution are not sufficient to avoid a contract, but there must be a reasonable ground for creating an apprehension in the mind of a man of ordinary courage and firmness that the threats will be carried into execution, and it must also appear that the threats operated directly upon the mind of the party so as to overcome his will. Obert v. Landa, 59 Tex. 475.' We note that Judge Henry, in the same case, Obert v. Landa, quoted by Judge Neill, again decided on another appeal, 78 Tex. 33, 14 S. W. 302, seems to have modified the rule in so far as it erects a standard of resistance to be that of a man of ordinary courage and firmness; and the Court of Civil Appeals in the case of Gray v. Freeman, 37 Tex. Civ. App. 561, 84 S. W. 1107, speaking through Justice Fly, distinctly modified that part of the rule by deciding that the resisting power of the individual 'under all the circumstances of the situation, and not any arbitrary standard, is to be considered in determining whether there was duress.'"

In Burnett v. Continental State Bank, 191 S. W. 174, Judge Hodges says:

"To constitute the duress here relied on the agents of the appellee must have made the threats of a criminal prosecution to which Burnett testified."

The following additional authorities are cited by appellee in her brief, which we believe sustain the charge of the court and verdict of the jury: Merchant v. Cook, 21 D. C. 145; Leflore v. Allen, 80 Miss. 298, 31 South. 815; Morse v. Woodworth, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525; Hargreaves v. Korcek, 44 Neb. 660, 62 N. W. 1086; Bane v. Detrick, 52 Ill. 27; Bayley v. Williams, 4 Griff. 638; Harris v. Carmody, 131 Mass. 51, 41 Am. Rep. 188; Bank v. Kusworm, 88 Wis. 188, 59 N. W. 564, 26 L. R. A. 48, 43 Am. St. Rep. 880; Heaton v. Norton Co. Bank, 5 Kan. App. 498, 47 Pac. 576; Schultz v. Catlin, 78 Wis. 611, 47 N. W. 946; Schultz v. Culbertson, 46 Wis. 313, 1 N. W. 19; Adams v. Irving Nat. Bank, 116 N. Y. 606, 23 N. E. 7, 6 L. R. A. 491, 15 Am. St. Rep. 447.

By the eighth assignment, appellants complain of the action of the court in refusing to give their special charge, as follows:

"You are instructed that the undisputed evidence in this case shows that, after the execution and delivery of the deed in question, Clara J. Harlan ratified her former act in making the conveyance, and for that reason you must return a verdict in favor of the defendants on the issue of the deed having been executed under duress."

Defendants requested the submission of special issue No. 1, as follows:

"After the execution and delivery of the deed in question to the Houston Ice & Brewing Company did Mrs. Harlan thereafter deliberately enter into a rental contract with that company by the terms of which she was to have the right to remain in said house on the payment of a rental of $20 per month?"

—to which the jury answered, "No"; and also special issue No. 1a, as follows:

"Did she thereafter deliberately sign an instrument, and acknowledge it before H. P. Barry on December 11, 1914?"

—to which the jury answered, "No."

The defendants were not entitled to an instructed verdict on this issue. Viewing all of the facts in this record, it was clearly a matter for the jury. This was recognized by the defendants in asking the court to submit issues Nos. 1 and 1a, which issues were answered by the jury against them.

By the eleventh assignment of error appellants question the answer of the jury to these issues. We think the testimony amply sufficient to sustain these findings. Hence we adopt as a further finding of this court issues Nos. 1 and 1a, and the answers of the jury thereto.

By their assignments 12 to 24, inclusive, appellants complain of the argument of the Honorable George C. O'Brien, of counsel for appellees. We have carefully examined this argument, and find many things in it which have been condemned by the courts of this state. Having found that the testimony sustains the verdict of the jury on the issue of duress, we will further add that these findings are sustained by a very great preponderance of the testimony—a preponderance so great that in our judgment this argument, though subject to criticism, could not have affected the verdict of the jury.

We have carefully examined all other assignments made by the appellants and overrule them.

Finding no reversible error in this record, this cause is affirmed.

HIGHTOWER, C. J., having been of counsel in this case, did not sit in the disposition of same.

BROOKE, J. At the present term of this court an opinion was rendered in this case affirming the judgment of the trial court. Associate Justice WALKER delivered the opinion of the court. Chief Justice HIGHTOWER, having formerly been of counsel in the litigation, did not participate in the decision. In due time a motion for rehearing was filed by the losing party, and such motion for rehearing is pending now. The present writer, on consideration of the case on motion for rehearing, found that he was unable to agree to the correctness of the former disposition of the appeal. This situation having developed, and a third member of the court being necessary to a decision, Chief Justice HIGHTOWER certified the fact of his disqualification to the Governor, who thereupon appointed R. E. MASTERSON as one of the justices to sit in the case with the other members of the court. A majority of the court, as now constituted, now finds, upon consideration of the case on rehearing, that the court cannot assent to the former disposition of this appeal, and therefore this opinion.

[1, 2] Appellants' assignments of error, from the twelfth to the twenty-fourth, inclusive, complain of the action of one of the counsel, in his closing argument to the jury, in using, among other things, the following language:

"Keep that in mind as you go through all this testimony, you cannot sell a homestead for a debt. You might take a double-barreled shotgun and make the woman sign the deed; you might say that there stands the penitentiary doors open for her husband, and excite such fear in her mind so as to save her husband from the pen and disgrace, she signs, but the deed isn't worth the paper it is written on. He had two puppets that he had reduced to absolute slavery, and they were totally dependent upon him.

212 S.W.—50

Look at their letters. Read their letters. Do you tell me that woman signed that deed in order to pay a debt for beer—or money that her husband had spent in their interest of employment? That he spoiled his body and blasts his soul, and that she turns around and says I will pay the debt because he owes it—I will pay the debt to keep my husband from disgrace and the penitentiary."

The objection was that the argument was improper, calculated to prejudice the jury against the defendant, and to cause it to consider matters in connection with the case other than the evidence, and had no basis in the evidence or evidence to support same, and which argument militated improperly against the defendants, and was calculated to cause the consideration of those matters not raised by the evidence and not properly to be considered in connection with the case; that said argument was then and there objected to by the defendants, and the objection by the court overruled, to which action of the court defendant then and there excepted.

There are two propositions under the twelfth assignment. The first is that it is reversible error for counsel in argument to go outside of the record and discuss matters not in evidence, or to base argument on matters not supported by the evidence; and, second, that inflammatory argument of counsel, unsupported by the evidence, constitutes reversible error.

We shall consider quite a number of cases in which improper argument has been used, and especially the elementary cases.

Rules 39, 40, and 41 for the district and county courts (142 S. W. xx) require that counsel shall be required to confine the argument strictly to the evidence and to the argument of opposing counsel. It is the duty of the district judge, under such requirement, to keep counsel within the record, and not to jeopardize appellants' rights by sanctioning, by inference, the highly wrought and inflammatory argument of counsel.

The case of the American Express Co. v. Parcarello, 162 S. W. 927, was a case appealed by the American Express Company, and on the original opinion affirmed; but, on a motion for rehearing, reversed and remanded for improper argument, which argument, in substance, was that there was no more reprehensible practice in the administration of justice than the taking of statements by railroad companies, bringing them into the courthouse, and when the witness took the stand to attack and denounce him as a liar. The argument was objected to, but the court remained silent. The court says:

"Can it be said, then, that the remarks of the counsel, when viewed in the light of the court's silence, did not have an improper influence upon the jury, as the same pertained to the vital issue in the case? The majority of this court

are of the opinion that said remarks made in the opening argument were calculated to have, and did have, such an influence; nor can it be said that the experienced counsel, in making the remarks, was indulging in idle talk. We feel constrained to say, as was said by Chief Justice Stayton in Moss v. Sanger Bros., 75 Tex. 321, 12 S. W. 619: 'The course pursued in this case was one that no court of justice ought for a moment to tolerate, and it certainly must be true that the judge who tried this case did not fully understand the language of counsel or he would not have permitted it, would have rebuked it, and ought to have punished its author.'"

The case of Colorado Canal Co. v. Sims, 82 S. W. 531, was a case reversed solely upon the grounds of improper argument. The court said:

"As to whether the negligence charged against appellant proximately caused the damages complained of, the testimony was conflicting, and of such a character that the jury might have found either way without their verdict being disturbed on appeal; for the court in an appropriate charge correctly presented the law upon the issues of fact."

The argument of counsel in the case was, in substance, that he did not want the jury to bring a verdict against the defendant, because it was a corporation, but God knows the irrigation companies of this country had swindled every man that had any dealings with them, and was then attempting to swindle and rob every tenant working under them, and that the evidence showed that this corporation was no better than any other. For the use of that argument, which was objected to and not withdrawn from the jury, the case was reversed. The court said:

"There can be no doubt that the use of the language complained of was as unwarranted and reprehensible as language could be. We can imagine nothing that would justify it, and there is nothing in the record that tends to show an intimation of anything to palliate it. Its only purpose could have been to prejudice the jury against the defendant, and influence them by such prejudice in finding their verdict. And we are not able to say, when the state of the evidence is considered, that the use of such language, not recanted by plaintiff's counsel, and unrebuked by the trial court, did not have the effect upon the jury in finding their verdict that it was evidently designed by plaintiff's counsel to have. This brings the case within the rule laid down in Railway v. Musick [33 Tex. Civ. App. 177], 76 S. W. 221; Hunstock v. Roberts (Tex. Civ. App.) 65 S. W. 677; Ry. v. Burton [25 Tex. Civ. App. 63], 60 S. W. 317; Garritty v. Rankin (Tex. Civ. App.) 55 S. W. 368; Ry. v. Bryan (Tex. Civ. App.) 28 S. W. 98—which requires a reversal of the judgment on account of the use of such language in argument and the failure of the trial court to grant a new trial on account of it."

We take occasion to observe that in the above case the court there said the evidence was such that a verdict either way would have been supported by the evidence, and we will say now, dealing with the argument in the instant case, to which appellant's counsel was objecting all the time, which objections were being overruled, and which argument was not being withdrawn from the jury; and, under the record, we cannot say but that a verdict in favor of appellants, under the testimony in this case, would not be without support in the evidence, and would not be set aside, because we recognize that the issue as to duress was an issue for the jury, and if the issue was not such that the plaintiff was entitled to an instructed verdict. Clearly, a finding on behalf of the appellants by the jury would have been supported by that evidence which made of the question of duress an issue of fact for the jury.

In the above case there was no positive expression or foundation to the effect that the jury had been influenced in reaching its verdict; but the court held that inasmuch as the argument was calculated to influence the jury, and that it was not withdrawn from the jury, and that the evidence would support a verdict each way, that the case would have to be reversed and remanded. In this case there is an additional and stronger fact, in that the jury, by its finding upon the question as to whether or not the instrument was a mortgage or an out and out conveyance, showed that it reached a verdict against the whole of the evidence in the record; and if it was not the improper and highly wrought argument appealing to the passions and prejudices of the jurors, we are lead to inquire what occasioned these men of average intelligence to go so far astray in reaching an improper verdict? The finding makes a positive case that they have been influenced by the argument, which was improper, and, if the evidence was such that a finding either way on the question as to duress would be upheld, how can an impartial observer say that the jury was not influenced and prejudiced and unduly moved and forced, against cool and calm deliberation, to find against appellants on the question of duress?

In the case of Hunstock v. Roberts, 65 S. W. 675, which was a case affirmed in the original opinion, and reversed and remanded on rehearing for the reason that certain argument used was improper, the case was one of circumstances, and the argument, in substance, was that the property was worth about $750, and that the plaintiff bid only $25 therefor, which was credited on the execution, and that the action was an attempt to confiscate the property. In passing on this question the court said:

"In a case like this, when the issue depended more or less on circumstantial evidence, it is impossible for us to say that the jury were not influenced by such references and argument.

Counsel always takes the risk of forfeiting an otherwise good judgment when such course is pursued, and we think the rule ought to be enforced in this instance."

There was nothing to point positively to the fact that the jury had been influenced in reaching its verdict, but the argument was repeated some three times, over the objection of counsel and the admonition of the court; whereas, in this case, it was repeated time and time again, through the whole course of counsel's argument, over the objection of counsel for appellants, with counsel appealing to the court, and with the court permitting such argument to go to the jury.

The case at bar was also a case of circumstantial evidence, with circumstances of such a nature as, to our minds, would seem to ponderate against the finding of the jury as to duress; for, up to the time the deed was signed by Mrs. Harlan, she had not discussed with any of the grantees the question of wiping out the shortage by a conveyance of the homestead to the grantee. She testified that when her husband came and told her he was short, and something had to be done, that she told him she would sign the deed some time that evening under no other circumstances unless he was short in his account. This testimony shows that she was exercising discretion, and that there was only one circumstance under which she would sign the deed, and that was if her husband was short in his account. Clearly, this would show that she was not coerced or duressed, but was willing, if it was shown that he was short, that she would sign the deed. Harlan said, in the conversation he had with Autry prior to going to see his wife, with reference to the execution of the deed, that he did not remember anything being said with reference to the bonding company or Autry's turning the account into the bonding company, and what would be done if he did; that he did not think the bond was discussed at all, but that he was under bond at the time. In answering Mrs. Harlan's letter of February 10, 1915, after the deed had been signed, Autry wrote that they were willing that Harlan should sell the property elsewhere and turn the proceeds over to them, and that they took the property when he stated that he had exhausted his efforts to sell it. Harlan further testified that he took the deed over to Autry, and supposed that would settle the whole thing and settle the account; that there was nothing said about the prosecution between him and Autry. The record further reflects that Mrs. Harlan paid rent upon the property after the deed to the grantee; that she and her husband acknowledged the Houston Ice & Brewing Company as their landlord, and that she willingly signed said instrument, and did not wish to retract it; that on January 2, 1915, Mrs. Harlan wrote Autry there was a party told her and her husband that they would like to get property on Liberty, but that she did not mention the place until she could notify Autry and find out if this one was for sale.

Autry testified that Harlan volunteered the giving up of the place to clear the account. He further testified Mrs. Harlan did not state to him in Houston that Mr. Harlan had said to her that she had to make immediate settlement of this, or else he would be turned over to the bonding company; that they did not discuss any bonding company at all; that it was not mentioned; that she did not tell him in Houston that Mr. Harlan had told her that if she did not execute that deed the matter would be turned over to the bonding company and that he would be disgraced; that he only had one conversation with her, and Harlan said that when she went with him to Houston that he did not remember whether she said anything to Autry about what he (Harlan) had told her in reference to being turned over to the bonding company; that he had no recollection of her stating that; and the further fact that though the deed was signed September 12, 1914, and the suit was not brought to set same aside until March 16, 1915, in which petition at that time it was not alleged that Mrs. Harlan was coerced or duressed into executing the instrument which is in suit, to our mind raises a strong case of circumstances that, in truth and in fact, the execution of the instrument was a voluntary act upon the part of Mrs. Harlan, and not occasioned by duress or coercion, and which is clinched by her voluntary statement, as reflected by the record, wherein she testified that she would sign the deed that evening under no other circumstances unless he was short in his account.

The case being one of so many circumstances, to our minds brings itself clearly under the opinion in Hunstock v. Roberts, supra; and, the question of duress depending more or less on circumstantial evidence, it seems to us that it would be impossible for us to say that the jury was not influenced by such persistent and consistent improper, prejudicial, and highly wrought argument as used by counsel in this case. If the jury showed upon one issue that it could not pass impartially on same, we could not say that it would impartially pass upon an issue where the evidence was merely conflicting, if it could not give appellant its rights when the evidence was wholly in its favor.

In the case of Miller v. Burgess, 136 S. W. 1174, the court, among other things, says:

"The first error assigned is to the following argument of appellee's attorney in his closing address to the jury: 'Gentlemen of the jury, why shouldn't this defendant, P. J. Miller, pay

to this poor working boy the amount of his note, when he (meaning Miller) lives on his ranch in Jones county and counts his white-faced Hereford cattle by the hundreds, and controls property and people like a feudal lord; when he owes to this plaintiff the amount of this debt, which represents hard, honest toil on his part.' This was objected to in behalf of appellant as inflammatory and prejudicial, and as entirely unsupported by any evidence in the cause.

"As shown by the bill of exceptions, the objections were overruled, and the argument permitted without interruption by the court, and without instruction to the jury not to consider it, although requested so to do by the defendant. It is in effect conceded, as indeed it must be from the record, that there is no evidence of the facts so stated in argument, and that it is inflammatory and prejudicial in character is evident. Appellee's answer to the assignment is that, 'in an action founded upon tort, where the amount of damages might reasonably be affected thereby, inflammatory language used by an attorney constitutes error; otherwise it does not, and should not'—the contention being that, inasmuch as the suit was upon a liquidated demand, and the amount to be recovered, if anything, being fixed, the argument could not have enhanced the verdict by contrast of the financial condition of the parties litigant.

"But we think the contention unsound. The vital issue was whether appellant signed the note upon which the suit was founded, and, while appellee's testimony may have preponderated in his favor on this issue, appellant's explicit denial rendered the issue sharply drawn, and the argument may well have affected the minds of the jury in consideration of this issue. As has been often determined, inflammatory argument, unsupported by any evidence in the record, constitutes error, where it tends to affect the issue of liability, as well as when its tendency is to augment the amount of damages. See C., R. I. & T. Ry. Co. v. Musick, 33 Tex. Civ. App. 177, 76 S. W. 219; Electric Co. v. Black, 40 Tex. Civ. App. 415, 89 S. W. 1087; H. E. & W. T. Ry. Co. v. McCarty, 40 Tex. Civ. App. 364, 89 S. W. 807; Ft. W. Belt Ry. Co. v. Johnson [59 Tex. Civ. App. 105], 125 S. W. 387. In the present case we cannot assume that the purpose of appellee's counsel in making the argument was any other than to thus affect the issue of liability, for, as is now contended, no other issue was left for the determination of the jury."

In the case of Railway Company v. Johnson, 59 Tex. Civ. App. 105, 125 S. W. 387, the court says: ·

"Error is assigned to the matter shown in the following bill of exception, viz.: 'Be it remembered that on the trial of the above-entitled cause, and while the attorney for the plaintiff, Mr. Carlock, was making the closing speech for the plaintiff, he addressed the jury substantially as follows: "How easy it is for these two men (witnesses for the defendant) working together, knowing that this man received a serious injury, knowing if the company was responsible it was responsible through their negligence—how easy it was for them to concoct a story against this plaintiff, and say there are two of us against one, two of us against Mr. Johnson, and our shrewd lawyer will get up there and argue to the jury, and the jury will go out and find for the defendant, and this man will hobble through life a cripple without a dollar." At which time, and before Mr. Carlock had finished the sentence, the defendant's counsel interposed an objection to this argument on the ground that it was outside of the record, and improper, and tended to prejudice the jury against the defendant, and awaken their sympathy for the plaintiff, and on which objection of the defendant the court took no action, and the defendant excepted to the failure of the court to sustain the objection and excepted to the action of the counsel in making the argument, and here presents this bill of exception No. 6, which it asks be approved and filed in this cause.' The bill of exception has been duly approved, and we think that under the circumstances of this case the argument of appellee's counsel therein complained of requires a reversal of the judgment.

"The issues were sharply conflicting. On the issue of appellee's alleged want of notice and of the intended movement of the cars, the testimony of both the pinman and the foreman is in direct contradiction of that of appellee on the same subject. If appellee had such notice, the contention of negligence on appellant's part would be greatly weakened, if not wholly destroyed, while the inference of contributory negligence on appellee's part would in that event be greatly strengthened. So that it was vitally important to appellee's case that the foreman and pinman should be discredited. No effort appears to have been made to impeach them in the regular way. No conflict or contradiction, no inherent improbability of story, in the testimony of these witnesses, is pointed out; and to some of us, at least, there appears to be no justification for the insidious charge that these witnesses had deliberately concocted a false story and committed perjury in the effort to maintain it. That the charge was veiled in the form of a suggestion renders it none the less prejudicial in character. Judgments have often been reversed because of similar language in violation of the rule which requires counsel in argument to confine themselves strictly to the record, and we could perhaps with profit quote from the authorities on this branch of the subject; but, inasmuch as appellant has emphasized another view of the argument, we will, for the present, content ourselves with a citation of some of the cases. See Magoon v. Boston M. R. Co., 67 Vt. 177, 31 Atl. 156; C., R. I. & T. Ry. Co. v. Musick, 33 Tex. Civ. App. 177, 76 S. W. 219; C., R. I. & T. Ry. Co. v. Jones, 81 S. W. 60; M., K. & T. Ry. Co. of Texas v. Huggins, 61 S. W. 976; Moss v. Sanger Bros., 75 Tex. 321, 12 S. W. 619; Beville v. Jones, 74 Tex. 148, 11 S. W. 1128; G., C. & S. F. Ry. Co. v. Scott, 7 Tex. Civ. App. 619, 26 S. W. 998. * * *

"The argument was clearly inflammatory, and in view of the fact that the verdict was for $8,000, $3,000 more than appellee himself finally concluded could be supported, we cannot say that the jury were uninfluenced thereby. Reference in argument to the poverty or wealth of contending parties is almost if not quite universally condemned. * * *

"In some of the cases cited the judgments were not reversed because of the improper ar-

gument, but in all such cases it will very generally be found that the court was able to say from the record that because of the court's instruction to disregard it, or for some other cause, the improper argument was without prejudicial effect."

In Railway Co. v. Musick, 33 Tex. Civ. App. 177, 76 S. W. 219, the following language is found:

"The first assignment of error relates to argument and to action of the court, which is thus shown by the following bill of exception: 'Be it remembered that upon the trial of the above-entitled cause, when R. M. Wynne, Esq., of the attorneys for the plaintiff, was presenting his argument to the jury, which was the closing argument in the case, he made the following statement to them: "Gentlemen of the jury, there never was a railroad company sued but what it made out a perfect defense, like the one in this case." To which statement and argument on the part of said counsel defendant then and there objected, as being out of the record and improper argument, and asked that the jury be instructed not to consider it. In answer to which objection the said counsel for plaintiff asserted that the argument was proper and within the record, and the court passed upon the objection as follows: "Colonel, I hardly think that the argument is proper." Whereupon Mr. Wynne said to the jury: "Gentlemen, I withdraw that statement, and ask you not to consider what I said; objected to." To which action of the court in failing to instruct the jury not to consider the argument, and in failing to sustain, pointedly and plainly, defendant's objection to said argument, the defendant then and there, in open court, excepted, and here tenders this, its bill of exception No. 1, and asks that same be allowed and made a part of the record in this case, which was accordingly done.' It is not even contended that the argument was justified by the facts proven on the trial, and that it was hence improper we think must be conceded. * * * Upon this issue the evidence was sharply conflicting, if it did not preponderate in favor of appellant; and the evident tendency, if not the purpose, of the objectionable argument was to break down or to weaken appellant's evidence on this important issue in the case. The evidence also sharply conflicted on the issue of whether it was the duty of the operatives of the engine to give warning whistle in the absence of a flag in place, and upon the whole case, and, as it appears in the bill of exception, we have been unable to avoid the conviction that the argument was most harmful, especially in view of the probable inference of the jury, from the circumstances shown in the bill, that the court was by no means confident that the objection urged was well taken, and that the counsel named believed his remarks justified, notwithstanding his withdrawal thereof. We think the argument, on objection, should have been promptly and pointedly rebuked by the court, and the jury as pointedly instructed to disregard it. We think this case fairly within the principle of Ft. Worth & D. C. R. Co. v. Burton [25 Tex. Civ. App. 63], 60 S. W. 316; Garritty v. Rankin (Tex. Civ. App.) 55 S. W. 368; Hunstock v. Roberts (Tex. Civ. App.) 65 S. W. 677. In the first two cases cited doubt is to be implied whether an instruction to disregard the objectionable argument discussed would cure the error; and in the last case the objectionable argument was in effect withdrawn, and the jury expressly told by the court not to consider it, notwithstanding which the judgment was reversed on this ground alone, the court saying: 'In a case like this, when the issue depended more or less on circumstantial evidence, it is impossible for us to say that the jury were not influenced by such references and argument. Counsel always takes the risk of forfeiting an otherwise good judgment when such course is pursued, and we think the rule ought to be enforced in this instance.' Appellee insists, however, that ' * * * the error was harmless, as the verdict of the jury was not excessive, and is supported by, and not against, the preponderance of the evidence.' While we have not felt that we should disturb the judgment on the ground of its being excessive, although complained of as such, and although it is apparently at least liberal, in view of the fact that appellee had no bones broken, and that the physicians testifying expressed the opinion that appellee would finally get well, it is nevertheless to be noted that the argument complained of does not relate so much to an enlargement in the amount of the judgment. It seems more appropriately adapted to the issue of whether appellee was entitled to any judgment—to discredit appellant's testimony in support of an absolute defense; and it is on this ground that we base our conclusion, rather than on the ground of a tendency to inflame the minds of the jury, and hence possibly increase the size of the judgment. * * * As assigned, we find no other error requiring a reversal."

In the case of Railway Co. v. Black, 40 Tex. Civ. App. 418, 89 S. W. 1088, the court says:

"In this state of the record, while defendant's counsel, R. E. L. Knight, Esq., was making his argument to the jury, in discussing the testimony of the witness Jack Goldman, in reference to the banana peel having been stepped on, he used substantially the following language: 'I do not like a witness like Goldman, who will make one statement to me on outside of the courthouse, and make another statement inside of the courthouse.' Plaintiff's counsel, in concluding the argument for the plaintiff, referring to this statement of Mr. Knight, used substantially the following language: 'That Mr. Knight knew that his conduct was not fair to the witness; that if he intended to intimate to the jury that the witness had made a statement to him (counsel) different from what he had made in the courtroom on the trial, that he should have laid the predicate to have contradicted him, and then got on the witness stand and testified, and not undertake to supply his lack of testimony by his statement as counsel; and added that they had laid one predicate to contradict Goldman by the witness Jones, but the jury had observed that the witness Jones had not been brought forward.' To this Mr. Knight, counsel for the defendant, stated in the presence of the court and the jury that the witness Jones was sick in bed and un-

able to come; whereupon counsel for the plaintiff retorted that, if that were true, he ought to have asked to have the case postponed until that witness' presence could have been secured, and that he (counsel for plaintiff) would not have opposed it; and then added: 'That was an unfair argument for Bob to use (meaning Mr. Knight). If he wished to use an argument of that character, he should have waited until he had an able-bodied plaintiff to oppose him, and should not have used such an argument in a case like this, where the plaintiff is a poor girl, compelled to support a widowed mother, and where his client is a rich corporation.' To this argument by plaintiff's counsel, defendant, by W. R. Harris, its counsel, then and there in open court objected, for the reason that it was highly prejudicial to the interests of defendant for plaintiff's counsel in his argument to get out of the record and comment upon the relative wealth of the contesting parties, and to comment upon the fact that plaintiff was not able-bodied, and was compelled to support a widowed mother, and verbally asked the court to instruct the jury that such remarks were improper, and not to consider same, which request was in an undertone to the court, and was not heard by the jury. The court overruled defendant's said objection, but not in a tone to be heard by the jury, and refused and failed to instruct the jury that such remarks were improper, and refused to instruct the jury to disregard the same, and the defendant then and there in open court excepted to the said remarks of plaintiff's counsel, and then and there excepted to the court's failure and refusal to sustain its said objection, and then and there excepted to the court's failure and refusal to instruct the jury that said remarks were improper and to disregard the same."

The court said:

"Now the question arises whether or not, in view of the evidence in this condition, the argument of the counsel, as stated, was of a nature calculated to influence the jury. As to whether or not, as a matter of fact, the jury was actually influenced, it is impossible to say; but whether, in view of the conflict in the evidence, it was of a nature calculated to influence the verdict, is probable. To insist to the jury that the plaintiff was a poor girl, and that the defendant was a rich corporation, was an argument, to say the least, of a nature that might be calculated to influence the jury to turn the scale in favor of the poor girl against the rich corporation. We might indulge in an extensive argument along this line, in order to demonstrate the effect and influence an argument of this nature might have upon the mind of the jury; but its unwise effect is so clear that demonstration · is unnecessary. It is contended that the evidence tends to show that these facts existed. Suppose that to be true, that would not justify the argument. If the evidence should show that one of the parties was rich and the other poor, it would not authorize counsel, in discussing the case to the jury, to make use of that fact."

[3] We have been discussing the twelfth assignment of error, and, in order that it may be understood that counsel was continuing to use inflammatory argument and strong language, we will state the language complained of in the thirteenth to twenty-fourth assignments, inclusive. In the thirteenth assignment of error this language is complained of: .

"Mr. Autry knew that this was their puppet, so he comes over to Beaumont, as he says in his letter he had been after him a long time to settle up, and he comes here and meets him at the station, and then he says, we don't know why he met him at the station, we don't know what was said to him at these ten other times he had come over here to talk to him—no we couldn't get that out, objections were too profuse. Mr. Autry, with his sneering smile, dodged the questions, and astute counsel poured in confusion by his multiplicity of objections, so we cannot say what he said and what was done by him, and how he treated him for the year prior to this time when he called him up in that room."

This argument was duly objected to by defendant, and the objection was overruled by the court.

The fourteenth assignment complains of the following argument:

"I leave it to you as reasonable men to say whether or not, from all the circumstances and the manner of those parties, whether or not they had been putting the thumbscrews on this old fellow to make him settle. At any rate, he comes in, and Pete meets him down there, and Mr. Autry says: 'Come up to the hotel; come up in the room and shut the door'—and those things are settled right now. Why didn't they take him in a saloon? There are witnesses there, and somebody could testify, but nobody but Autry will be believed about this testimony here behind closed doors—with a man that is down. So he takes him in that room, and if he wasn't going to browbeat him and threaten him, why didn't he take him down there to one of his customers, and say: 'Come here and talk. I want a witness; I want somebody to see how fair I am to you. I don't want to take any advantage of an employé that is submissive and is under my domination?' Why didn't he sit down in the lobby of the hotel, where he could see somebody? Perhaps Pete would be too independent where there were witnesses. Pete might rebel down there in the hotel; Pete might speak out too loud; but he was there in the room, with the door closed."

The language used in this assignment was objected to by defendant, and the objection overruled by the court, and said remarks permitted to remain before the jury.

The language complained of in the fifteenth assignment is as follows:

"He took him out and they looked at the place. And Mr. Autry didn't go in the house! Why didn't he go in the house? There is a little woman that has been with Pete, and he has been in their employ for fifteen years. Why didn't he go in and tell this woman, shake hands with her, and say, 'Good evening, Mrs. Harlan'? (He writes after he has got his deed that he is sorry.) Why didn't he go in there and tell her he was sorry? Because he couldn't

face the woman that he was about to rob of the roof over her head! And he comes back, and old Pete follows him like a little puppy dog, and he says, 'Well, did your wife sign the deed?' And he says 'I can get her to sign the deed.' He knew that nine women out of ten would do the same thing. * * * We don't know how long that conversation was. We don't know the bitter tears that may have been shed in that house that night. We don't know the groans and all the trouble and heartache that was there. There is in the threshold of the door where in the evening he was welcomed home, and there is the little nook where she watched when he came in sight, eloquent with the memories of married life—and she was to give it up! Yes; to save Pete!"

This argument was objected to by defendant on the ground that it was calculated to arouse the passions on the part of the jury, and its prejudice, and to cause it to consider matters other than evidence, and to be guided by sentiment rather than evidence in the case, and because of the fact that said argument was based upon matters not in evidence; to all of which argument defendants then and there in open court excepted, and the court overruled same.

The sixteenth assignment complains of this language:

"And what happened in Houston when she went over there? Here she was—trembling and abashed before this great man who held a whip over them, and had held it over them for fifteen years."

This language was objected to by defendant, the exception was overruled by the court, and the remarks permitted to remain before the jury.

The seventeenth assignment complains of language as follows:

"And when they brought this deed back, don't you see they were uneasy? Why? Because they were trying to get around that law which says you cannot take a woman's home for a debt. They are striving to get around it, and they write this very solemn letter. * * * Those fellows were getting up those letters, manufacturing testimony to beat this testimony in court, and that is why it is self-serving and isn't worthy of your consideration. * * * This transaction is not completely closed.

"What does this mean? It means, gentlemen, this transaction is not completely closed—Pete can go to the penitentiary yet! What did it mean? She knew. Yes, gentlemen, but the state of Texas says you don't have to give up your home yet."

This argument was not based upon evidence in the case, was calculated to prejudice the jury against the defendants, and to arouse the passions of the jury as against the defendants without cause, accredited defendants of manufacturing evidence other than the evidence before it; to all of which argument defendants then and there in open court excepted, and the exception was overruled.

The eighteenth assignment complains of the following language:

"It is in evidence that they gave him money to spend—that cropped out in their own letters here. He may play the booby act; but why, if they knew he was weak, did they give him any money to spend? You may blame Mr. Harlan for throwing away money or being short; you may blame him for embezzlement; but the Constitution of this state says that the wife shall have a home, irrespective of what the husband does. * * * Gentlemen, they held a whip over their heads until they thought that they could get the property. And don't they acknowledge the unsoundness of their deed when they want to patch it up by letters and correspondence, drawn, possibly, by the ablest counsel in the city of Houston, trying to get from a poor little woman that which the Constitution says she shall have. * * *"

This argument was objected to because calculated to arouse the passions and prejudice of the jury against the defendant, not based upon the evidence in the case, and it is likely to cause the jury to consider matters other than evidence in the case, which objections were overruled by the court.

The nineteenth assignment complains of the following language:

"They were sucking and pounding all the grit out of him because he was a self-convicted man, conscious of having done wrong. We will give him money to spend, and if he spends it, and we reap a benefit, we will avail ourselves of it, and if he strays over the traces we will say you have embezzled. They wanted a slave, gentlemen, and they had two slaves when they consummated this transaction—as completely as any nigger was a slave before the war. Or, if you don't sign it, if you don't give it to us, we will put Pete in trouble. It was done to save him from disgrace! Oh, how good!"

Objection was made the argument was beyond the record, had no facts in evidence to sustain it, calculated to arouse the passions and prejudice of the jury, which objections were overruled.

The twentieth assignment is along the same lines, as is also the twenty-first, twenty-second, twenty-third, and twenty-fourth. We will produce the twentieth assignment of error, which complains of the following argument used by counsel for plaintiff in his closing argument to the jury:

"The letter says that they had it done to save him from disgrace. It was their duty, gentlemen, to report him to the grand jury, or to turn him over to the proper authorities, for you have got no right to compound crime, you have got no right to turn his wife out in the weather without a home. The Constitution of this state says so, and you know it, gentlemen. Yes; disgrace because of his misappropriation of funds! And 'only took the property when he said he had exhausted his efforts to sell it.' 'If you don't sell it I will sell it.' That is what they said to him, 'If you don't sell it, I will take it and I will sell it.'"

The above extracts will indicate what the exceptions were based on.

This court has, quite a number of times, held that improper argument alone was sufficient to reverse a case. We refer to the case of Railway Co. v. Swift, 204 S. W. 135; Kirby Lumber Co. v. Youngblood, 192 S. W. 1107. The opinion in this latter case was written by the late Justice A. E. Davis, of this court, in which case counsel, in substance, said that it did not matter so much who was technically at fault, whether the plaintiff or the defendant; that these big corporations ought to pay a man working for them for the loss he has sustained, and that if these corporations used these men to make their wealth they should give up part of their wealth to the injured employé to compensate him for injury. This argument was objected to by counsel, which objection was sustained by the court; but the argument was not withdrawn from the jury, and Judge Davis, in reversing the case, said:

"It is clear from the statements made by plaintiff's counsel that he could have no other object in view than to arouse the passion and prejudice of the jury. The argument was not based upon any evidence adduced upon the trial. It is true the trial judge admonished said attorney 'that he should in his argument keep within the record, and that the argument was improper'; but when the seeds of passion and prejudice are sown and fall in fallow ground, it is difficult, indeed, to destroy its effect, even by the most careful admonition and painstaking instructions; and when counsel, either in their argument to the jury or during the trial, in the presence of the jury, go outside of the record, and indulge in remarks that are clearly intended to arouse the passion or prejudice of the jury, and likely to influence them, such conduct not only authorizes, but requires, the trial court to set aside the verdict of the jury; and this should be done, even though the court may have instructed the jury to disregard such argument. Rules 39 and 41, District Court (142 S. W. XX); Railway Co. v. Jarrell, 60 Tex. 270; Texarkana & Ft. Smith Ry. Co. v. Terrell, 172 S. W. 742; Moss v. Sanger Bros., 75 Tex. 323, 12 S. W. 619."

In the recent case of Stark et al. v. Brown et ux., 193 S. W. 716, the following language was used, to which exception was taken:

"These corporations and big rich landowners want to buy up all the land in this county and hold it, and let it rot and keep the common people from getting any of it and let them rot."

Counsel objected to the argument, but such argument was not withdrawn from the jury, and the writer, in passing upon the case, used this language:

"There can be no question as to the object of counsel in using this language; whether or not it really influenced the minds of the jury we have no means of knowing. * * * We have recently animadverted upon the practice of counsel going outside of the record, and using language which could be used for no other purpose than to influence the jury, and in the recent case of Kirby Lumber Company v. Youngblood, 192 S. W. p. 1106, not yet officially reported, we took occasion to condemn such practice."

Many cases have been reported from the Supreme Court concerning argument appealing to the passions and prejudices of the jury, and that court has used strong language condemning such argument.

In the case at bar, where the whole evidence in the record was practically that of interested parties, and in the record there was a question of whether or not the instrument was a mortgage or was an out and out conveyance, and the language used by counsel was highly improper and inflammatory, and instead of being withdrawn from the jury, over timely objection, was permitted by the court to be and was considered by the jury, this is, indeed, in our opinion, a dangerous doctrine to be announced and placed of record, that such character of argument will be permitted to stand as not sufficient cause for reversal.

Without considering any other of the assignments of error, of which there are many in the record, outside of the assignments with reference to the improper argument, it is sufficient for us to say, without going into the matter extensively, but resting our opinion solely upon the improper argument presented to the jury, that the cause, of necessity, must be reversed and remanded for a new trial; and it is accordingly so ordered.

HIGHTOWER, C. J., did not sit.